TRANS–AMERICAN STEEL CORPORATION, Plaintiff,

v.

FEDERAL INSURANCE COMPANY, Travelers Indemnity Company, and B&W Steel Erectors, Inc., Defendants,

and

BATSON–COOK COMPANY and H. J. Russell Construction Co., Inc., Defendants and Third-Party Plaintiffs,

v.

CITIZENS TRUST BANK, Third-Party Defendant and Fourth-Party Plaintiff

v.

B&W STEEL ERECTORS, INC., Fourth-Party Defendant.

Civ. A. No. C78–731A.

United States District Court, N. D. Georgia, Atlanta Division.

March 30, 1982.

Herman L. Fussell, Frances M. Toole & Charles Choyce, Stokes & Shapiro, Atlanta, Ga., for plaintiff.

J. Littleton Glover and Thomas H. Rogers, Newnan, Ga., for Batson-Cook, Russell, Federal Ins. Co. and Traveler's Indem.

Alfred S. Lurey, Robert E. Shields, William C. Campbell, Atlanta, Ga., for Citizens Trust Bank.

Julius A. McKanders, II, Atlanta, Ga., for B&W Steel.

## ORDER

ROBERT H. HALL, District Judge.

## I. PROCEDURAL BACKGROUND

Pending before the court are the third-party defendant's motion for summary judgment and the third-party plaintiffs' motion to open a default judgment against them. The motion to open the default judgment is unopposed and is hereby GRANTED. For the reasons set forth below, the third-party defendant's motion for summary judgment is also GRANTED.

This case began over three and one-half years ago as a materialman's suit arising from Project CE–320, part of the construction of the Metropolitan Area Rapid Transit Authority (MARTA). The materialman, Trans-American Steel Company ("TASCO"), brought suit against the construction project's general contractors, Batson-Cook

Company and H. J. Russell Construction Company, Inc. (collectively "BCR") their sureties, Federal Insurance Company and Travelers Indemnity Company, (collectively "the sureties") and the project subcontractor, B&W Steel Erectors, Inc. ("B&W"), for sums due on steel delivered to B&W.

TASCO, the materialman, alleged that B&W, the sub, had forged TASCO's endorsements on two payment checks, jointly payable to TASCO and B&W, which were drawn by BCR, the general contractor. Consequently, BCR filed a third-party complaint against Citizens Trust Bank ("CTB"), both the payor and depositary bank, for honoring the checks with the allegedly false endorsements. In turn, CTB, as fourth-party plaintiff, sued B&W, as fourth-party defendant, seeking indemnity based on B&W's endorsement warranties.

On or about January 7, 1981, without the knowledge or consent of CTB, the other parties to this suit entered into a settlement of TASCO's remaining claims against them. The settlement was in the amount of $36,-000.00—$33,743.20 of damages and $2,256.80 of interest—paid to TASCO. Based on the settlement, a consent judgment was entered. As a result of the settlement, and prior orders of the court, the only remaining claims are those between BCR and CTB, the third-party plaintiff and defendant, as to whether or not CTB wrongfully honored a BCR check on the basis of a forged endorsement.

## II. FACTUAL BACKGROUND—BCR'S CLAIM AGAINST CTB

Beginning in late 1976, B&W agreed to serve as a subcontractor erecting fabricated steel on eleven MARTA projects. Each of these projects rested on distinct contracts, although the total number of general contractors involved was fewer than eleven, since some general contractors were in charge of more than one project. On each of these projects, B&W subcontracted for the purchase of steel from TASCO.

BCR, the general contractor on Project CE-320, entered into its contract with B&W, calling for B&W to provide labor and material supplies for the erection of certain reenforcing steel, on May 18, 1977. Because B&W was a new and very thinly capitalized firm, it was unable to obtain a bond for its work. Subsequent to this development, the parties agreed to modify the May 18 agreement to provide for separate supply and labor contracts. The supply contract was signed June 23, 1977. On or about the same date, B&W entered into its supply contract with TASCO, calling for the delivery of steel pursuant to B&W's contract with BCR. Under the supply contract BCR was required to pay for the steel by joint check to B&W and TASCO.[1]

BCR claims that it was lead to believe that TASCO and B&W were using standard, 30 day credit terms. In fact, TASCO agreed to allow B&W extremely generous credit terms in order to help the fledgling company to generate cash flow. The terms were, payment, 120 days from the end of the month an invoice was dated (hereinafter, "the 120-day credit terms"). This arrangement, arrived at with regard to Project CE-320, was similar in most respects to arrangements on all the contracts between B&W and TASCO, on the other ten MARTA projects in which they were both involved.

---

1. Use of a separate supply contract, with joint payment to the sub and materialmen, appears to be a common arrangement for general contractors dealing with unbonded subs. The purpose of this procedure is to limit or extinguish a materialman's potential bond claims against the general contractor because of non-payments by the sub. Assuming the sub and materialmen have industry standard, thirty-day credit terms, the general contractor would allow thirty days or more to pass after the materialman delivers supplies to the job site. Then, the general contractor writes a joint check, backed up by invoices from both the materialman and the sub, and sends it to the sub. The sub endorses the check, and sends it on to the materialman for its endorsement. When the materialman endorses and deposits the check, it is entitled, by virtue of its credit terms, to payment for all supplies delivered thirty days or more before the date of the check. Consequently, the materialman's deposit of the check can extinguish any potential claim for non-payment against the sub or the general contractor.

In late 1977 or early 1978, B&W fell into financial difficulty, defaulting on payments to TASCO on several, perhaps all, MARTA projects.[2] TASCO promptly brought suits against the general contractors and their sureties seeking payments on the contractors' payment bonds.[3]

The instant dispute concerns the first two payment checks made by BCR for steel delivered by TASCO for Project CE–320. Pursuant to its contracts, BCR made both checks jointly payable to TASCO and B&W. The first, dated August 26, 1977, was for $21,578.87. The second, dated October 3, 1977, was for $12,164.23. The endorsement of both parties was supplied by B&W, and B&W deposited both checks in its account at CTB. CTB honored both checks, withdrawing funds from BCR's account, also at CTB, and placing them in B&W's account. Simply put, BCR alleges that B&W forged TASCO's endorsement, and the CTB is liable in the amount of the checks for honoring the forged endorsements. Ga.Code Ann. § 109A–4–401; *See also, Trust Co. v. Refrigeration Supplies, Inc.*, 241 Ga. 406, 246 S.E.2d 282 (1978).

## III. CTB's CONTENTIONS ON ITS MOTION FOR SUMMARY JUDGMENT

CTB's motion for summary judgment against BCR has two main pillars. First, CTB argues that related litigation involving CTB, TASCO and B&W establishes that TASCO *did* authorize B&W to endorse joint-payee checks issued by MARTA project general contractors. Accordingly, CTB maintains that relitigation of the question of forged endorsements is barred by collateral estoppel. BCR concedes that if TASCO's endorsement was not forged, then CTB has no liability to BCR. However, BCR insists the issue of forged endorsements in this case has not been decided or foreclosed by any prior litigation.

**2.** B&W stopped doing business in March, 1978.

**3.** *Trans-American Steel Corp. v. J. Rich Steers, Inc.*, Civil Action C78–732A (N.D.Ga. March 21, 1980) (Ward, J.), *aff'd*, 670 F.2d 558 (5th Cir. 1982). *Trans-American Steel Corp. v. Hensel-Phelps Construction Co.*, Civil Action C78–794A (N.D.Ga. Jan. 21, 1981) (final judgment) (Edenfield, J.). *Trans-American Steel Corp. v.*

Second, CTB argues that even if TASCO's endorsement was forged, neither TASCO nor BCR suffered any damages, because payments in the amount of the disputed checks were fully and properly applied to TASCO's account when they came due, pursuant to the 120-day credit terms between TASCO and B&W.

### A. *Is the issue of forged endorsements barred by collateral estoppel?*

In *Trans-American Steel Corp. v. Hensel Phelps Construction Co.*, C78–794A, (N.D.Ga. Jan. 21, 1981), one of the other cases brought by TASCO after B&W's collapse, the issue of B&W's authorization to endorse TASCO's signature to checks from the general contractor was also at issue. The general contractor in that case had also sued CTB for honoring an allegedly false endorsement.

The special master in that case made a finding of fact that, "TASCO through its President, Mr. Jack, expressly authorized B&W to endorse joint checks on behalf of TASCO." Report and Order, November 5, 1980, Fact 57 (Long, Special Master) (hereinafter, "Report and Order"). He also found that, "even if it could be concluded that there was no express authorization given to B&W, the evidence establishes that implied authority was given through admitted credit terms and undisputed conduct of the parties." Report and Order, Conclusion 11.

■ On this basis, CTB asserts that TASCO, and thus BCR, is collaterally estopped to contend that TASCO's endorsements were unauthorized. Although this is a diversity suit, federal, not state, collateral estoppel requirements unquestionably apply in determining whether an earlier decision

*Underground Construction Co.*, Civil Action C78–806A (N.D.Ga. Nov. 17, 1980) (voluntary dismissal) (Edenfield, J.). *Trans-American Steel Corp. v. Santa Fe Engineers*, Civil Action C78–828A (N.D.Ga. Nov. 30, 1981) (voluntary dismissal and judgment for plaintiff) (Vinings, J.).

of a federal court sitting pursuant to its diversity jurisdiction estops a claim. *Stovall v. Price Waterhouse Co.*, 652 F.2d 537 (5th Cir. 1981).

■ Federal collateral estoppel rules apply upon the showing of three criteria:

1) that the issue at stake be identical to the one involved in the prior litigation;

2) that the issue have been actually litigated in the prior litigation; and

3) that the determination of the issue in the prior litigation have been a critical and necessary part of the judgment in that earlier action.

*Id.* at 540.

■ It is apparent that each of these elements is lacking here. The issue in *Hensel-Phelps* was whether TASCO authorized B&W to endorse checks from Hensel-Phelps, not from other contractors. The BCR joint-payee checks were not put into evidence in *Hensel-Phelps* and there is no basis to convert the master's broad statements that B&W was authorized to endorse on TASCO's behalf into a conclusive adjudication of B&W's authority to endorse checks from every general contractor doing business on projects supplied by TASCO. That issue simply was not litigated in *Hensel-Phelps*; even if it were, the fact of B&W's authority to endorse checks from BCR was not a necessary part of the judgment as to B&W's authority to endorse checks from Hensel-Phelps.

As BCR points out, in the *Hensel-Phelps* case, joint checks were issued over an extended period of time and the first joint checks were issued during the tenure of Mr. Murray Jack as President of TASCO. However, in the present case, Batson-Cook/Russell issued only two joint payee checks over a six week period, the first of which was issued approximately two months after Murray Jack left TASCO. CTB relies on an alleged authorization by Mr. Jack; but whether Mr. Jack's authorization extended to payments begun subsequent to the *Hensel-Phelps* payments, and after his departure, is obviously subject to some question.

Although the master in *Hensel-Phelps* cited evidence that Mr. Jack's successors at TASCO, particularly Mr. Dovi, knew of and extended B&W's authorization to endorse checks for TASCO, on a motion for summary judgment all facts and inferences must be resolved in favor of the party against whom summary judgment is sought. Drawing the inferences most favorably to BCR, there could be many reasons not explored in *Hensel-Phelps* why Mr. Jack extended authority to B&W to endorse *Hensel-Phelps* checks, but had no intention of extending the risk involved in this procedure to other projects.

Accordingly, the court concludes that the judgment in *Hensel-Phelps* does not estop BCR from asserting the lack of authorization for B&W to endorse checks on TASCO's behalf, and that there exists an issue of fact as to whether such authorization had in fact been given after September, 1977, or in regard to BCR checks.

B. *Even if CTB charged BCR's account for an item not properly payable, did BCR suffer any damages?*

Under Ga.Code Ann. § 109A–4–401 a bank may charge its customer's account for items "properly payable." By negative implication, this section denies the drawee bank the right to charge amounts not properly payable. A check bearing a forged endorsement is not "properly payable." *See* White & Summers, Uniform Commercial Code § 17–3 (1972) at 559. *See also, Perini Corp. v. First National Bank*, 553 F.2d 398 (5th Cir. 1977).

Assuming, for purposes of the summary judgment motion, that B&W had no authority to endorse for TASCO, then CTB's honoring of the check over the forged endorsement obviously creates liability under § 109A–4–401. Absent bad faith or special damages the maximum extent of CTB's liability is the total amount of the two joint-checks wrongly honored. Exclusive of interest, this is the only amount claimed by BCR.

■ However, under Georgia law, the liability of a depositary bank for wrongly honoring a forged endorsement will be reduced by any amount the forger has already paid in restitution to the drawer. *Thornton & Co., Inc. v. Gwinnett Bank & Trust Co.*, 151 Ga.App. 641, 260 S.E.2d 765 (1979). Arguably, *Thornton* is not directly on point, because it was a suit by a payee for conversion, under § 109A–3–419(1). The court has not found any cases of a forger's restitution with precisely the same alignment of parties as in the present case. However, the policy of the UCC, and the logic of cases decided under its provisions, seek to place ultimate liability for forged endorsements on the forger first, and only thereafter on the parties who dealt with him or warranted his signature. White & Summers, *supra*, § 15–1 *et seq.*; *Perini*, 553 F.2d at 404.

■ Adopting the Thornton rule to the present facts, as this diversity court believes the Georgia courts would themselves do, the court holds that the liability of a depositary or drawee bank for violation of Ga.Code Ann. § 109A–4–401, must be reduced by any amounts the forger has paid in restitution to the drawer or payee.

The *Thornton* rule, cast in terms of restitution, can be viewed as a corollary of the rule that a party who transfers or pays a check bearing an incomplete or forged endorsement incurs no liability if the proceeds of the check reach the intended payee. See *Perini*, 553 F.2d at 412; *Coplin v. Maryland Trust Co.*, 222 Md. 119, 159 A.2d 356, 358 (1960). BCR contends that this rule, or any corollary of it, is inapplicable because the rule requires a showing that the actual proceeds of the check reached the intended payee, that the proceeds were applied by the payee for the purposes intended by the drawer, and that no special damages resulted. *See Taylor v. Equitable Trust Co.*, 269 Md. 149, 304 A.2d 838 (1973); *Hillsley v. State Bank*, 24 A.D.2d 28, 263 N.Y.S.2d 578 (1965); *Tonelli v. Chase Manhattan Bank*, 41 N.Y.2d 667, 394 N.Y.S.2d 858, 363 N.E.2d 564 (1977).

Admittedly, CTB has not attempted, nor does it claim to be able, to trace the proceeds of the two checks through B&W's account to TASCO's. However, tracing the proceeds is not a mechanical or technical requirement. The purpose of tracing the proceeds is merely to show that wrongly honoring a check did not cause the plaintiff to sustain damages, despite the eventual receipt of funds by the intended payee. *See, e.g., Hillsley, supra*, (conversion caused plaintiff to lose mechanic's lien despite payment of amount equal to converted funds moments after conversion). The presence of such damages could defeat a banks claim of restitution, or the delivery of funds. *Hillsley, supra*. In the instant case, however, CTB has shown there are no such damages to BCR, alleged or potential, which flowed from the wrongful endorsement of the two disputed checks. Indeed, BCR seeks recovery only on the amount of the disputed checks.

CTB has persuasively argued that the alleged forger, B&W, eventually paid over to TASCO, the wronged payee, an amount equal to that portion of the proceeds of the two joint payee checks to which TASCO was entitled.

The August 26 check, drawn by BCR to B&W and TASCO, in the amount of $21,578.97, was based on B&W invoice No. 223, also in the amount of $21,578.97. The B&W invoice was backed up by the following TASCO invoices:

| Number | Date | Amount |
|---|---|---|
| 1336 | 7–18 | 2,881.96 |
| 1370 | 7–30 | 8,035.79 |
| 1419 | 8–08 | 5,718.35 |
| 1420 | 8–15 | 4,939.40 |
| | | $21,575.50 |

Thus, BCR expected all but $3.47 of the August 26 check, to go to TASCO, and to extinguish claims for the four indicated invoices.

The October 3 check, drawn by BCR to B&W and TASCO, in the amount of $12,164.23 was based on B&W invoice 252, also in the amount of $12,164.23. The B&W invoice was backed up by the following TASCO invoices:

| Number | Date | Amount |
|--------|------|--------|
| 1484 | 8–22 | 2,930.00 |
| 1460 | 8–29 | 5,676.76 |
| 1505 | 8–29 | 3,557.47 |
|  |  | $12,164.23 |

Thus BCR expected all of the October 3 check to go to TASCO, and to extinguish claims for the three indicated invoices.

On November 30, 1977, TASCO's ledger shows a credit to B&W's account of $10,-917.75 for full payment of invoices 1336 and 1370. The payment date is not coincidental; those two invoices were dated in July. Therefore, under the 120-day credit terms payment was required at the end of November.

And, on December 31, 1977, TASCO's ledger shows a credit to B&W's account of $22,821.98 for full payment of invoices 1419, 1420, 1460, 1484, and 1505. Once again, the payment date is not coincidental; those invoices were dated in August. Therefore, under the 120-day credit terms, payment was required at the end of December.

The only "additional damage" conjured up by BCR is founded on speculation that if TASCO endorsed the two disputed checks itself, and took immediate possession of the proceeds of the checks, B&W could have used the proceeds it paid TASCO in November and December on the July and August invoices, to make other payments to TAS-CO, and thereby reduce BCR's liability. Under the 120-day credit terms, however, B&W did not owe TASCO any money,—at least on the September, October, November or December invoices—until January, 1978, or later.[4]

It is beyond doubt that TASCO received funds from B&W, which both B&W and TASCO intended to cover all the July and August invoices on Project CE–320, and thereby to extinguish any inchoate claim based on those invoices, that TASCO might have against BCR.[5] Whether this payment is viewed as restitution by the alleged forger, or a flow-through of the proceeds to the intended payee, it was sufficient to reduce CTB's liability to zero.

In reaching its decision, the court has assumed, without deciding, the truth of BCR's proposition that TASCO's mere endorsement of joint-payee checks would have extinguished TASCO's bond claims, even though under the 120-day credit terms TASCO might not have been owed money by B&W. The court agrees with BCR that under *Trust Company v. Refrigerated Supplies, supra,* TASCO's status as a joint-payee gave it a valid cause of action against CTB for honoring a forged endorsement, even though TASCO may not have been owed funds by either the drawer of the check, or the co-payee. Similarly, BCR had the "exclusive privilege" to designate the payees of its checks. But the validity of a cause of action under *Refrigerated* does not protect against summary judgment on the facts here. Unlike the supplier in *Refrigerated,* who was never paid by the sub, TAS-CO did get paid.[6] Had TASCO actually signed the two disputed checks and thereby extinguish its bond claims against BCR, nothing would have been different than it was as between BCR, B&W and TASCO, by December 31, 1977, when B&W paid TAS-CO for the July and August steel deliveries.

Obviously, B&W's collapse caused losses. BCR's ledger shows that it paid B&W for all the steel TASCO delivered. But B&W's failure to pay that money over to TASCO flowed from decisions made by B&W, TAS-

4. TASCO only sued BCR for $55,065.35, the amount B&W owed TASCO as of January 1, 1978, after payment for the invoices covered by the disputed checks.

5. B&W's payments to TASCO may have resulted from the misapplication of a general contractor's payment. But there is no basis to show B&W violated a duty regarding funds from Project CE–320 in order to make the November and December payments to TASCO.

6. The court also observes that TASCO had no contract with BCR. Its inchoate claims against BCR arose by operation of the bond, or on a theory of *quantum meruit.* To the extent the 120-day credit terms were intentionally misstated to BCR's detriment TASCO could be estopped from denying receipt of the BCR payments made to B&W. *See,* Order and Report, *supra.*

CO and BCR. For example, it was BCR's own decision to stop paying for the Project CE–320 steel by joint-payee checks after the first two checks.

CTB's alleged wrongful honoring of the two disputed checks did not change its status to that of an insurer for all the risks which flowed from B&W's and TASCO's unusual business deals, or BCR's decision to stop paying with joint-payee checks.

The court has reviewed the many affidavits, depositions, pleadings, and briefs, filed in this case. Taking all facts and drawing all inferences in the light most favorable to BCR, the court nonetheless must conclude that CTB's motion for summary judgment should be GRANTED.