Russell T. LUND, Jr., Lund's Inc. and
Wardwell M. Montgomery,
Plaintiffs,

v.

CHEMICAL BANK, Defendant.

CHEMICAL BANK, Third–
Party Plaintiff,

v.

LAIDLAW ADAMS & PECK, INC.,
Third–Party Defendant.

No. 84 Civ. 1621 (RWS).

United States District Court,
S.D. New York.

June 23, 1992.

Fredrikson & Byron, P.A., Minneapolis (Ted S. Meikle, of counsel), Dorsey & Whitney, New York City (Susan Lesinski, of counsel), for plaintiff Russell T. Lund, Jr.

Parker Chapin Flattau & Klimpl, New York City (Stephen G. Rinehart, of counsel), for plaintiff Wardwell M. Montgomery.

Chemical Bank Legal Dept., New York City (Eileen J. Berkman, James L. Condren, of counsel), for defendant Chemical Bank.

## OPINION

SWEET, District Judge.

Plaintiffs Russell T. Lund, Jr. ("Lund") and Wardwell M. Montgomery ("Montgomery") seek in this diversity action to recover from defendant Chemical Bank ("Chemical") for the amounts of two checks dated March 9, 1981, drawn on Chemical (the "Checks"). The Checks, one in the amount of $716,946 and the other for $46,056, were fraudulently negotiated by William T. Rubin ("Rubin"). As set forth in the following findings of fact and conclusions of law, because Lund and Montgomery failed to mitigated their damages and because they are equitably estopped, their complaints will be dismissed, and judgment entered in favor of Chemical.

*Prior Proceedings*

Lund, Lunds Inc., and Montgomery initiated this action in 1984 against Chemical. Chemical in turn brought a third-party action against Laidlaw Adams & Peck ("Laidlaw"), a securities firm which had deposited the fraudulently endorsed checks and which was later dissolved.

This action has achieved an impressive procedural history since then. In an opinion dated June 16, 1987, this Court held that, among other things, the absence of actual delivery of the Checks would not bar the Plaintiffs from recovery. *See Lund v. Chemical Bank*, 665 F.Supp. 218, 226 (S.D.N.Y.1987) ["*Lund I*"], *on recons.*, 675 F.Supp. 815 (S.D.N.Y.1987) ["*Lund II*"]. On March 16, 1989, the Second Circuit affirmed this part of *Lund I* while reversing and remanding to determine whether Rubin's acts were authorized, the facts re-lating to Chemical's defense under N.Y.U.C.C. Law § 3–406, and the applicability of N.Y.U.C.C. Law § 3–419(2) to a co-endorsee. *See Lund's Inc. v. Chemical Bank*, 870 F.2d 840, 851–53 (2d Cir.1989) ["*Lund III*"].

After remand from the Second Circuit, summary judgment was granted to Chemical against Lund's Inc. on the basis of the then-recent New York State court decision in *State v. Barclays Bank of New York, N.A.*, 151 A.D.2d 19, 546 N.Y.S.2d 479 (1989) ("*Barclays I*"). *See Lund v. Chemical Bank*, No. 84 Civ. 1621, slip op., 1990 WL 17711 (Feb. 16, 1990) ["*Lund IV*"]. *Barclays I* was the first fully reported decision of an intermediate New York appellate court on the delivery issue. In it, the Third Department took note of *Lund III* and expressed its disagreement with the Second Circuit's analysis. *See* 546 N.Y.S.2d at 481.

Lund's Inc. moved to reconsider *Lund IV* in light of the New York Court of Appeals having granted review of *Barclays I*. This motion was granted by endorsement on May 4, 1990, "pending the determination of the *Barclays Bank* case in the Court of Appeals". That court affirmed *Barclays I* on October 18, 1990, *see State v. Barclays Bank of New York, N.A.*, 76 N.Y.2d 533, 561 N.Y.S.2d 697, 563 N.E.2d 11 (1990) ["*Barclays II*"], and Chemical moved for entry of judgment. Chemical's motion was granted in an opinion dated March 27, 1991, which found that the check in question had not been constructively delivered to Lund's Inc. *See Lund v. Chemical Bank*, 760 F.Supp. 51, 55 (S.D.N.Y.1991) ["*Lund V*"]. Judgment was entered dismissing the complaint of Lund's Inc. on April 5, 1991.

Discovery meanwhile proceeded on the remaining claims, and a bench trial was held from March 2–4, 1992. Final submissions were completed on April 13, 1992.

*Findings of Fact*

*The Background of FTC and the Relationship of the Parties*

Despite dyslexia, Lund graduated from the University of Minnesota in 1959 after

having served as a pilot in the Korean War. He then worked as a researcher for ten years. Montgomery was a consulting engineer for Motorola.

Lund, Montgomery, and four former military pilots found Flight Training Center ("FTC") in 1968 as a flight school and aircraft rental business. Lund had no day-to-day management role, but did invest money in the corporation and flew its aircraft. Montgomery served as FTC's president but was never particularly active in the company's affairs. By 1975, all of the original owners had left except Lund and Montgomery.

FTC hired Janet Karki ("Karki") as a bookkeeper in 1976. She told the others in the company that many of FTC's financial problems stemmed from an unfavorable airplane lease with William Rubin ("Rubin"). When FTC tried to renegotiate this lease, Rubin offered instead to participate in an effort to make the company profitable.

Rubin told Lund and Montgomery that he had made other troubled companies profitable, and that he had a background in aviation and was already operating an air taxi service. Rubin was hired as a consultant in 1977. He soon controlled expenses, advertised, and increased FTC's customer base. As a result, FTC started making money on the formerly unprofitable lease from Rubin. At Rubin's suggestion, FTC also leased a Learjet to offer training to pilots who had GI Bill benefits. The Learjet became a major profit center for FTC.

In 1978 Montgomery resigned as an officer of FTC. Rubin became president, a director, and chairman of the board.

When the lease for the first Learjet was about to expire, Rubin proposed that, rather than renewing the lease, Lund should buy a Learjet and lease it to FTC. After locating a Learjet 25, Rubin and Lund decided both would buy it in a 50/50 joint venture. They rejected a partnership arrangement for tax purposes.[1] Lund arranged for the financing, and both Lund and Rubin signed the note. A checking account was established in which to make deposits and write checks to pay for expenses. Rubin's P.O. Box was listed as the address on the account.

The plane crashed, and two new planes were purchased—a Learjet 25D and a Learjet 28—as well as a used Learjet 24. Separate Joint Venture Agreements were executed by Lund and Rubin for each of these planes. Lund does not remember the documents, including having signed them or any of the surrounding circumstances relating to them.

The Joint Venture Agreements specified that ownership of the aircraft was vested equally between Lund and Rubin, see ¶ 2, and that each was to pay his proper share of the venture's expenses:

> 5. *Expenses.* Each Joint Venturer shall pay his proper share of the expenses of the joint venture, including legal, accounting, insurance premiums, finance charges, and other expenses directly relating to the aircraft and its operation, to the extent that revenues from the operation of the aircraft are insufficient to pay expenses in full as the same come due.

Each Joint Venture Agreement also contained the following provisions:

> 3. *Purpose of Joint Venture.* It is expressly declared to be the purpose of this joint venture to acquire the aircraft at the purchase price and under the terms and conditions set forth in the purchase order hereinabove described, and to lease said aircraft after delivery or resell said aircraft at a profit.

---

1. In *Lund III,* the Second Circuit affirmed this Court's earlier determination that Rubin and Lund had entered into a partnership with respect to the ownership of the aircraft. 870 F.2d at 846; *see Lund I,* 665 F.Supp. at 222; *Lund v. Flight Transportation Corp.,* 669 F.Supp. 284, 288 (D.Minn.1985), *aff'd,* 825 F.2d 1249 (8th Cir.), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1886, 95 L.Ed.2d 494 (1987). Subsequent discovery has revealed the existence of "Joint Venture Agreements" between Rubin and Lund for each of the planes. Although the documents show that the two did not intend to enter into a partnership, the existence of the documents does not affect the treatment of their relationship for purposes of this action. *See* Joint Venture Agreements, art. 8; *infra.*

4. *Management.* The Joint Venturers hereby appoint William Rubin as the manager of the enterprise. The manager shall have full charge of and control over the management of the aircraft and of all matters arising out of this enterprise. He shall cause accurate records to be kept concerning the purchase, financing, leasing, and other aspects of the operation of said aircraft. Manager agrees that he shall take no extra compensation for his management function hereunder. The manager shall employ reasonable care and diligence in the management of the aircraft, including but not limited to keeping said aircraft insured. The manager shall furnish each Joint Venturer periodically, at reasonable intervals, with a statement showing the receipts and expenditures and such other information as he may deem pertinent.

. . . . .

8. *Control of Venture.* It is expressly recognized and agreed that in all of its dealings with third parties in respect to this enterprise, any one of the Joint Venturers may bind the other Joint Venturer individually and the joint venture collectively, as is the case in a general partnership. Accordingly, although it is contemplated that the manager will generally be the Joint Venturer who shall conduct such affairs, the signature of any one of the Joint Venturers shall be sufficient for all business purposes in regard to the enterprise, including but not limited to the signing of checks, the transfer of title to the aircraft, the mortgaging or encumbering the aircraft or any similar matter.

Montgomery and Karki, who by then was FTC's Executive Vice President and Secretary and a director, also jointly purchased a Cessna P210 in 1979 under a Joint Venture Agreement containing similar provisions.

Joint bank accounts—sometimes called the jet accounts—were used for the airplane transactions. Rubin did not maintain the funds separately for the different airplanes owned by the Lund Joint Ventures. Rubin never paid Lund money from outside the jet accounts, and Lund never received any payments from third parties relating to the aircraft. Specifically, FTC never paid any funds related to the airplanes directly to Lund. Lund had no financial dealings with FTC related to the aircraft other than through the joint accounts.

Rubin did not make any substantial contributions to the expense account and, as of March 9, 1982, had withdrawn $1,093,225 more than he had deposited. Lund had contributed $1,610,840 more than had been withdrawn for his account.

*The Transactions Giving Rise to the Checks*

To raise capital needed for growth and a new hangar, Rubin proposed in 1979 that FTC issue stock to the public. To achieve this, Rubin hired James McGovern ("McGovern") of McGovern, Opperman & Paquin as FTC's counsel, and made arrangements with an accounting firm and a securities underwriter. Lund and Montgomery, as board members of FTC, approved the subsequent offering despite their lack of prior relevant experience. The closing took place in 1979, and neither one attended. The proceeds of the offering were used by FTC for various purposes.

Shortly after the initial offering was completed, FTC began to plan a second offering. McGovern again represented FTC, and Laidlaw became the lead underwriter.

Lund and Rubin determined that they should sell the Learjet 25D and the Learjet 28 to FTC to reduce the Minnesota tax on the planes. On January 11, 1981, they undertook by signed inducement letters to sell the Learjet 25D to FTC for $2.4 million and the Learjet 28 for $2.5 million upon the completion of the second public stock offering. Montgomery and Karki proposed the sale of their Cessna to FTC for $180,000 and executed similar letters.

A prospectus for 1.0 million shares of FTC was prepared on March 2, 1981, which referred to the proposed sales as well as to Lund's status as an officer, director and shareholder of 341,000 shares (20.12% of FTC stock) and Montgomery's similar status as director and shareholder of 315,000

shares (18.59% of FTC stock). Rubin owned 448,240 shares (26.45% of FTC stock) as of February 27, 1981. The prospectus also stated at page 27 that FTC would purchase the Learjet 25D and the Learjet 28 "from Messrs. Rubin and Lund," and the Cessna P210 from "Mr. Montgomery and Ms. Karki".

*The Closing and Negotiation of the Checks*

At the closing, Laidlaw presented the Checks, which it had prepared and which were drawn on Chemical and were payable to the order of FTC. Karki, as corporate secretary of FTC, endorsed the Checks, making the $716,946 check payable to the order of "William Rubin and Russell T. Lund, Jr."; and the $46,056 check payable to "Wardwell Montgomery and Janet Karki". Karki's endorsement represented payment for the aircraft sold to FTC.

McGovern had prepared power of attorney forms purporting to authorize Rubin to endorse the Checks for Lund and Montgomery. The documents were, however, forgeries. On Lund's purported power of attorney form, for example, his forged signature appears twice, once on the proper line and once in the space for the notary's signature. There is no indication of a stamp or seal having been affixed in the place on the form reserved for a "NOTARY STAMP OR SEAL," nor anywhere else on the form.

McGovern presented the power of attorney forms at the closing and discussed the transfer of the Checks with a representative of Laidlaw. The Checks were then endorsed payable to the order of Laidlaw. Rubin endorsed the $716,946 check in his own name and as purported attorney-in-fact for Lund. The $46,026 check was endorsed by Karki and by Rubin as purported attorney-in-fact for Montgomery.

The Checks were given back to Laidlaw. Laidlaw endorsed the Checks and deposited them in its account at Chemical Bank on which the Checks were drawn.

*Chemical's Role*

Chemical's Branch 66, the Wall Street Branch, handled accounts of customers which were brokers, dealers and underwriters, including Laidlaw. The account on which the Checks were drawn and into which they were deposited was maintained at Branch 66. Internal auditors for Branch 66 in audit memoranda done both before and after the date the Checks were deposited stated, "This department adheres to the Metropolitan Bank operational procedures, where applicable." The metropolitan operational procedures manual was a six or seven volume manual (the "Manual") to which the head of the department had access. No other manual existed at that time for Branch 66. The memoranda also stated that, "[a]mong the various functions performed by this department are: maintenance of paid check files and a teller's window for deposits made by Wall Street firms".

In its retail branches, Chemical had a specific policy with respect to double-endorsed checks payable to a corporation that were presented for deposit. A teller referred any such check over $500 to a supervisor. The supervisor would then determine whether the check would be accepted for deposit. *See* Manual § II, ¶ 5.4.6.A.(4), (5).

This policy illustrated Chemical's recognition of the risks of double endorsed checks initially payable to corporations. Such checks often provide an opportunity to circumvent corporate controls that create auditable paper trails, thus facilitating the misdirection of corporate funds.

Chemical's Tellers Training Manual also iterated that, for business accounts, double endorsed checks cannot be accepted without supervisor approval which would, if necessary, result in an inquiry to the officer responsible for the account. However, Branch 66 tellers were not trained under this manual and received no particularized formal training.

Chemical did not apply the Manual's procedures on double-endorsed checks to Branch 66 or to the Checks in part because of its relationship with its customers, the size of the transactions, and its reliance upon its knowledge of the customers' accounts. In the event of a forgery, Chemi-

cal looked to its depositor customer for indemnity. This was a common practice for other large banks in New York serving underwriter customers.

The Manual also included specific restrictions on the use of powers-of-attorney. Section I.1.4.1 provided:

> A power of attorney is a legal document authorizing one to act in certain situations as the attorney or agent of the grantor. The Bank's power of attorney form should be used. If the principal wishes to use a form other than the Bank's, the form must be submitted to the Legal Division for approval....

However, Branch 66 would accept endorsements by a purported power of attorney in general, or on the Checks, again relying upon the last endorsement.

*The Post–Closing Events*

After the March 1981 closing, Lund asked Rubin a few questions about the second offering, but did not ask Rubin whether the planes had been sold or even where the closing had taken place. Lund also asked Rubin for a copy of the prospectus after the closing, but Rubin never sent him one and Lund made no effort to obtain one other than by occasionally asking Rubin.

Montgomery and Lund, as shareholders, received FTC's September 1981 proxy statement which stated that the Learjet 28 and the Learjet 25D were bought and paid for by FTC on the March 9, 1981, closing date.

In late 1981 Rubin proposed to Lund that they purchase another aircraft, a Merlin. The tax treatment for this transaction was presumably contained in an unintroduced exhibit, Lund's 1981 tax return. Additionally, no accounting was presented as to whether Lund received any credit arising out of the earlier sales of aircraft to FTC for application to the purchase price of the Merlin.

Rubin also proposed to Montgomery in the fall of 1981 a joint venture to buy a Learjet 25D that regrettably turned out not to exist. In connection with this proposed venture, Rubin or Karki prepared a check payable to Montgomery in the amount of $54,734. At a meeting with Montgomery on December 31, Karki told Montgomery that the check represented his share of the proceeds of the sales of the P–210 and two other aircraft. Montgomery then endorsed the check for the purpose of investing in a Learjet 25D and also paid $6,600 in new money.

Montgomery later discovered that his cash investments with Rubin and Karki had been more than $54,734; his out-of-pocket cash contributions had totalled at least $56,860.82 and the capital gains from his earlier investments were not reflected in the December 1981 check.

Throughout the early part of 1982, Montgomery brought his suspicions to the attention of Rubin and demanded a reconciliation of his original investments and the aircraft sale proceeds. Montgomery also demanded the information by letter on February 24, 1982, two months after the late December meeting with Rubin and Karki. Rubin avoided the issue.

In June 1982 the Securities and Exchange Commission commenced an action against FTC, asserting that FTC and certain of its officers and directors, including Rubin, had engaged in a massive fraud upon the investing public. It was this investigation which gave Lund and Montgomery their first notice of the fraud of Rubin, Karki, and McGovern. Thereafter, FTC was declared bankrupt and placed into receivership. Rubin, Karki, and McGovern were imprisoned for their part in the fraud.

*Conclusions of Law*

*Chemical Bank is Initially Liable for Paying Checks Over Unauthorized Endorsements*

█ A forged signature generally is "wholly inoperative as that of the person whose name is signed". N.Y.U.C.C. Law § 3–404(1). If a bank pays such a check, it converts the check from the true owner. *See id.* § 3–419. Therefore, if the purported endorsements on behalf of Lund and Montgomery on the Checks were not authorized, Chemical converted the Checks.

In its consideration of the record underlying the initial grant of summary judgment, the Court of Appeals held that a partnership existed between Rubin and Lund for the purpose of owning aircraft. *See Lund III,* 870 F.2d at 846–47. However, after trial it has been found as set forth above that the relationship was that of Joint Venturers. The issue of Rubin's authority therefore remains.

The Joint Venture agreements by their terms treated the venturers as independent entities in connection with the acquisition or sale of the individual aircraft. Nevertheless, the agreements do not affect the analysis of Rubin's authority. They simply acknowledge, in Paragraph 8, that powers are given "as is the case in a general partnership". None of the powers enumerated expand or limit the parties' powers in a manner that would render Minnesota's enactment of the Uniform Partnership Act and general partnership principles inapplicable. *See id.* at 848.

N.Y.U.C.C. Law § 3–110(1)(d) states that a check "may be payable to the order of ... two or more payees together or in the alternative." A check also may be made payable to a partnership, "in which case it is payable to the partnership or association and may be endorsed or transferred by any person thereto authorized". *Id.* § 3–110(1)(g).

A check payable to two individuals, and not in the alternative, must be negotiated by both individuals. *Id.* § 3–116(b). As explained in the Official Comment to § 3–116:

> The changes [between the current statute and prior law] are intended to make clear the distinction between an instrument payable to "A or B" and one payable to "A and B." The first names either A or B as payee, so that either of them who is in possession ... may negotiate, enforce or discharge the instrument. The second is payable only to A and B together, and as provided in the original section both must endorse in order to negotiate the instrument, although one may of course be authorized to sign for the other....

It is commonly understood that one who makes a check payable to two individuals, their names joined by "and," provides protection not only to one's self, but to each payee, because the check must be signed by each before it is lawfully negotiated. This protection is called into play by the form of endorsement.

The $716,946 Check was endorsed as follows:

> Pay to the order
> of William Rubin
> and Russell T.
> Lund, Jr.
> Flight Transportation
> Corporation
> by Janet Karki
> its Secretary
> Pay to the order
> of Laidlaw, Adams
> & Peck, Inc.
> William Rubin
> William Rubin
> William Rubin
> Russell T.
> Lund, Jr. by
> William Rubin
> Attorney-in-fact
> for Russell T.
> Lund, Jr.

The $46,056 Check was endorsed:

> Pay to the order
> of Wardwell
> Montgomery and
> Janet Karki
> Flight
> Transportation
> Corporation
> by Janet Karki
> its Secretary
> Pay to the order
> of Laidlaw,
> Adams & Peck, Inc.
> Janet Karki
> Janet Karki
> William Rubin
> Wardwell
> Montgomery
> by William Rubin
> his Attorney-in-
> fact

The Checks as endorsed by FTC were thus payable to "two or more payees together". Lund's and Rubin's names, and Montgomery's and Karki's names on the Checks are joined by "and". They are thus "not in the alternative" and the Checks could be negotiated "only by all of them". If the Checks were payable to the joint venture, they could only have been so endorsed. The endorsements on behalf of Lund and Montgomery were therefore as attorney-in-fact.

This conclusion is not inconsistent with the Uniform Partnership Act. It provides that a partner signing on behalf of a partnership must do so in the partnership's name:

> Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument ... binds the partnership, unless the partner so acting has in fact no authority.... An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners.

Minn.Stat. § 323.08.[2]

In construing a similar provision, the United States District Court for the Northern District of Alabama stated: "[A] partner has only authority to bind his partnership on negotiable paper by a signature in the partnership name." *Belcher v. Birmingham Trust National Bank,* 348 F.Supp. 61, 98 (N.D.Ala.1968). Thus the act of a single partner in subscribing to a transaction outside the scope of the partnership did not bind the partnership. *Id.*

Likewise, a California court has held that:

> a contract, when signed by an individual, is presumed to be the paper of the individual partner whose name is signed to it, and the burden of proof is upon the holder to show affirmatively that the sig-

nature was intended for the signature of the firm.

*Refinite Sales Co. v. Fred R. Bright Co.,* 119 Cal.App.2d 56, 258 P.2d 1116, 1119 (1953); *see also Miller Publishing Co. v. Orth,* 133 Minn. 139, 157 N.W. 1083, 1083–84 (1916); *accord Rouse v. Pollard,* 129 N.J.Eq. 47, 18 A.2d 5, 7 (N.J. Ch.) ("If the transaction is outside the partnership business, the other partners are not liable and they are not bound"), *aff'd,* 130 N.J.Eq. 204, 21 A.2d 801 (1941).

In *Lund I,* this Court found that "[i]t is beyond dispute that Rubin's actions violated fundamental tenets of partnership law." 665 F.Supp. at 223. The Court of Appeals also stated:

> Unlike the situation in [*Lund v. Norwest,* 825 F.2d 1249 (8th Cir.1987)], where Rubin endorsed the insurance check to deposit it in a joint bank account which the partnership used in its aircraft business, check no. 56863 was transferred to Laidlaw in exchange for FTC securities which were issued to Rubin alone. On the face of it, such a transaction raises serious questions concerning the existence of a partnership purpose for its consummation.

*Lund III,* 870 F.2d at 847–48.

The various aircraft were owned by joint ventures. The forgery and the theft of the proceeds of the sale of the subject of the joint venture was not "for carrying on of the business of the partnership in the usual way." Minn.Stat. § 323.08. Indeed, the sale of the subject of the joint venture, the aircraft, made it impossible to carry on the business of the joint ventures. *See id.* § 323.08(3). Without the specific authorization of Lund, Rubin's actions could not bind their joint venture. Likewise, without Montgomery's specific authorization, the joint venture of which he was a member could not be bound either. *Id.; see Lund III,* 870 F.2d at 848.

For example, in *Hogs Unlimited v. Farm Bureau Mutual Insurance Co.,* 401

---

**2.** Minnesota law governs the partnership and joint venture issues. *See Lund III,* 870 F.2d at 845. Minnesota adopted § 9 of the Uniform Act without change in § 323.08. *See* Minn.Stat. Ann. § 323.08 historical note (West 1991).

N.W.2d 381 (Minn.1987), it was held that a partner's wrongful act of destroying a herd of hogs to collect insurance proceeds for the partnership was outside of the partner's scope of authority as a matter of law. The court held that:

> [c]ontrary to Farm Bureau's contention, there is no fact issue on whether Cerise was acting within the scope of his authority. As a matter of law, he was not.... [T]he needless destruction of the hogs, making continuance of the business futile, was not in furtherance of the partnership business.

*Id.,* 401 N.W.2d at 386.

Similarly, in *Winter v. Liles,* 354 N.W.2d 70 (Minn.Ct.App.1984), the court held that a partner had no authority to transfer a golf course out of a partnership because "the partnership's business was primarily the operation of the golf course ... [and] the statute denies authority to acts of a partner 'which would make it impossible to carry on the ordinary business of a partnership.'" *Id.* at 73 (quoting Minn.Stat. § 323.08); *see also* Minn.Stat. § 323.09; *accord Petrikis v. Hanges,* 111 Cal.App.2d 734, 245 P.2d 39, 42 (1952) (authority of partner to act on behalf of partnership "does not apply to a sale of the assets of the partnership"); *Hackney v. Johnson,* 601 S.W.2d 523, 525 (Tex.Civ.App.1980) (release of lease by less than all partners is transaction outside the course of the business).

After the sale of the aircraft, the only possible remaining business for the Joint Venture was to distribute or reinvest the funds. Because the Checks were not made out to the Joint Ventures but to the individual members jointly and because the powers of attorney were forged, Rubin's execution of the Checks could not bind the Joint Ventures, nor could it bind Lund or Montgomery individually. Because Chemical paid out on checks with unauthorized endorsements, it is initially liable.

*Chemical Has Not Established a Defense Under § 3–406*

N.Y.U.C.C. Law § 3–406 provides:

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

Chemical is entitled to raise this defense. *See Lund III,* 870 F.2d at 850.

To prevail, Chemical must prove first that it acted in good faith and in accordance with reasonable commercial standards in accepting the deposit of the forged check. *See id.* at 851. If it does, Chemical must then show that the Plaintiffs were negligent, and that negligence substantially contributed to the forgery. Chemical bears the burden of proof as to all these elements. *See Perley v. Glastonbury Bank & Trust Co.,* 170 Conn. 691, 368 A.2d 149, 153 (1976); *American Security Bank, N.A. v. American Motorists Insurance Co.,* 538 A.2d 736, 738 (D.C.1988).

Courts consistently address the question of "reasonable commercial standards" by examining a bank's efforts to detect forgeries. In *Belmar Trucking Corp. v. American Trust Co.,* 65 Misc.2d 31, 316 N.Y.S.2d 247 (N.Y.C.Civ.Ct.1970), for example, a check payable to two corporations was endorsed by one corporation, fraudulently endorsed by a second corporation, and deposited into the account of a third corporation. The court distinguished between the bank's obligation to protect against paying over forgeries and its right to indemnity. The court fully examined the U.C.C. and the case law as applied to a bank's duty to inquire of a customer depositing checks. In particular, it noted:

> "When the bank accepted the deposit of [its customer] and became his banking agent, the defendant [bank] was in complete control of its relations with [the customer]. It could, to safely protect itself in its dealings with [the customer], inquire as to [the customer's] relations with the plaintiff [true owner of the check], the authority [the customer] possessed, and could insist on an examina-

tion of the plaintiff's bylaws and minutes if it thought that necessary to protect itself. When it accepted the checks payable to the plaintiff and endorsed by [the customer] as president of the plaintiff for deposit to the account of [the customer] himself, it did so at its peril to ascertain whether [the customer] had authority to endorse them."

*Belmar*, 316 N.Y.S.2d at 252 (quoting *Wagner Trading Co. v. Battery Park National Bank*, 228 N.Y. 37, 41–42, 126 N.E. 347 (1920)). The court further noted that " '[o]ne who suspects, or ought to suspect, is bound to inquire, and the law presumes that he knows whatever proper inquiry would disclose,' " *id.* at 253 (quoting *Rochester & Charlotte Turnpike Road Co. v. Paviour*, 164 N.Y. 281, 286, 58 N.E. 114 (1900)), and concluded by finding that:

> [t]he Uniform Commercial Code has not changed the applicable commercial practice or the legal consequence where that practice is not observed. The warranties referred to in U.C.C. 3–417 and 4–207 . . . do not absolve a collecting bank, in my opinion, from the obligation of inquiry. . . .

*Id.*

Likewise, in *Perley*, a bank officer testified that it was the bank's usual procedure to accept checks without authenticating endorsements and then to rely on the bank's ability to charge the account of the payee if the endorsements were defective. The Court held:

> Such procedure may well be common among banks, but the defendants failed to show that such conduct is reasonable. An examination of signature cards to determine the genuineness of endorsements may not be entirely practical under modern banking methods, but we do not feel that that necessarily relieves banks of the risks of loss from payment on forged checks. The law places the risk of loss from forged endorsements on the drawee bank unless it can affirmatively prove the drawer's negligence and its own due care. Such a legal presumption accords with the practical realities of commercial banking transactions since

the banks are in a better position than private parties such as the Perleys to secure means of insurance against losses by forgeries.

368 A.2d at 155 (citation omitted).

Under N.Y.U.C.C. Law § 4–406, which may govern a dispute between a customer and its bank regarding forgeries, an issue can arise as to whether there was "a lack of ordinary care on the part of the bank in paying the item." N.Y.U.C.C. Law § 4–406(3). Section 4–103(3) provides that actions consistent with general banking usage can constitute a prima facie showing of "ordinary care". *Putnam Rolling Ladder Co. v. Manufacturers Hanover Trust Co.*, 74 N.Y.2d 340, 547 N.Y.S.2d 611, 613, 546 N.E.2d 904, 906 (1989). The New York Court of Appeals, in applying this provision, has stated:

> It would appear, therefore, that a customer could prove a bank lacked ordinary care by presenting any type of proof that the bank failed to act reasonably. In this case, plaintiff adduced such proof, to the satisfaction of the trier of fact, in the form of evidence that MHT's inspection procedures were so superficial as to offer no realistic opportunity to detect forged checks.

*Id.* 547 N.Y.S.2d at 613–14, 546 N.E.2d at 613–614.

■ Chemical presented evidence that its activities were in accordance with "reasonable commercial standards" because it handled the checks the same way Manufacturers Hanover would have handled them. However, that other banks employ similar procedures does not alone establish a reasonable commercial practice. *Id.; see also United States Fidelity & Guaranty Co. v. Federal Reserve Bank of New York*, 590 F.Supp. 486 (S.D.N.Y.1984), *aff'd*, 786 F.2d 77 (2d Cir.1986); *McDowell v. Dallas Teachers Credit Union*, 772 S.W.2d 183, 189 (Tex.Ct.App.1989).

For example, in *Medford Irrigation District v. Western Bank*, 66 Or.App. 589, 676 P.2d 329 (1984), the court found that, even though the defendant bank followed a generally accepted banking procedure by automatically paying all checks under $5,000

without any procedure to spot unauthorized signatures, its actions were unreasonable. The court reasoned that "[w]hile that approach, based on considerations of costs and efficiency, may be a prudent business decision and followed by most banks, it does not meet the bank's responsibility under the statutes." *Id.* 676 P.2d at 332; *see also Lund III*, 870 F.2d at 849; *McDowell*, 772 S.W.2d at 189 (credit union's compliance with common practices was not reasonable where common practice failed to establish procedure for signature-verifying drafts).

■ Additionally, a bank's failure to follow its own policies is unreasonable. *See, e.g., American Security Bank*, 538 A.2d at 738 (bank with commercially reasonable procedures that negligently failed to comply with those procedures did not act in accordance with reasonable commercial business standards); *Seattle–First National Bank v. Pacific National Bank of Washington*, 22 Wash.App. 46, 587 P.2d 617 (1978) (same).

■ Although Chemical's written policy requires that the legal department examine powers-of-attorney not on Chemical's form, Branch 66 determined that such language applied only to endorsements by its customers, and not to endorsements by noncustomers. Chemical was unreasonable in failing to inquire about Rubin's authority to sign for Lund as "attorney-in-fact," and in not asking to see a copy of the power of attorney.

Moreover, a bank following reasonable commercial standards would have attempted to verify the purported power of attorney. In *Kelly v. Central Bank and Trust Co. of Denver*, 794 P.2d 1037 (Colo.Ct.App. 1989), for example, an individual endorsed checks payable to one corporation and then deposited the checks in the account of another corporation. No authorization for such activity appeared in the bank's files. The court held that the bank did not act in accordance with reasonable commercial standards:

When faced with this atypical situation [where a corporation endorses a check to a third party], reasonable standards of

banking practice require a depository bank to make inquiry as to the reason and authority for the deposit to a third person's account of a check endorsed by a corporate payee before accepting the check for deposit.

Central Bank's own internal policy for accepting business deposits seemed to require as much. . . .

In light of these facts, the large number of checks, the large dollar amounts, and the fact that Central Bank's officers do not recall ever seeing a power of attorney or other authorization making Drown the agent of Tradecom, we conclude that a reasonable inference could be drawn that Central Bank's handling of deposits recklessly gave substantial assistance to Drown in his purported scheme to defraud.

*Kelly*, 794 P.2d at 1044 (citing *Belmar Trucking*, 316 N.Y.S.2d 247).

In *Belmar Trucking*, the court took:
judicial notice of the fact that it is not normal business practice for a corporate payee of checks to endorse them in blank and deliver them to third persons in the absence of an appropriate reason and pursuant to appropriate corporation authorization.

316 N.Y.S.2d at 251. It went on to describe what the bank should have minimally done with checks payable to a corporate payee and endorsed to third parties:

While reasonable inquiry to ascertain the facts is the standard, it might be observed that in practical terms the defendant, as the collecting bank, should have requested and received a duly certified corporate resolution, stating reason and authority for the endorsement and delivery of the check. . . .

*Id.* at 254; *see also Lund III*, 870 F.2d at 849 ("It hardly seems onerous to require a bank to check the bona fides of an endorsee's bold representation that it is authorized to sign a $716,946 check as attorney-in-fact for its co-endorsee.").

Here, Branch 66 failed to comply with Chemical policies applicable to every other branch. If Branch 66 had followed these

policies, presumably it would have caught the forgery. Instead, it was satisfied as long as the last endorsement was by its customer and that customer was financially stable. This decision by Chemical to rely on its indemnity right does not constitute a reasonable commercial practice for preventing a conversion, thus barring it from establishing a § 3–406 defense based on the proven negligence of Lund and Montgomery.

Reasonable commercial standards would require Chemical to have applied its own policy and to have asked Laidlaw for a copy of the powers of attorney before cashing three checks totaling well over $1 million. If it had done this, and looked at the forms, it should have refused to pay the checks because of the irregularities on the forms.

*Neither Montgomery or Lund Were Entitled to More Than One Half of the Proceeds of the Forged Checks*

■ Each of these Joint Venture Agreements provides at ¶ 7 that "each Joint Venturer shall share equally in all profits and losses of the enterprise."

Furthermore, Lund's 1979 federal tax return revealed that for tax purposes Lund used exactly ½ of the purchase prices of the Learjet 28 and Learjet 25D as the "Asset Cost" of such aircraft. Lund's accountant, who represented him before the IRS, testified that Lund owned only ½ of the 28 and 25D airplanes.

■ A co-payee may recover the full face amount of a check bearing his forged endorsement only if the drawee fails to establish that the co-payee was entitled to less than the full amount. Here, Chemical has established that Lund and Montgomery were entitled to half of the face amount of the Checks. Therefore, if they are entitled to recovery, Lund and Montgomery are limited to that amount. *See Lund III*, 870 F.2d at 853–54.

*Lund and Montgomery Failed to Mitigate their Losses*

■ A party generally is not, however, allowed to recover for a loss which it could have reasonably mitigated itself. *AMF,*

*Inc. v. Cattalani*, 77 A.D.2d 779, 430 N.Y.S.2d 731, 733 (1980). As stated by Judge Friendly:

[A] tort defendant is not liable for consequences preventable by action that reason requires the plaintiff to take.... [T]he community's notions of fair compensation to an injured plaintiff do not include wounds which in a practical sense are self-inflicted.

*Ellerman Lines, Ltd. v. The Steamship President Harding*, 288 F.2d 288, 290 (2d Cir.1961); *see Federal Insurance Co. v. Sabine Towing & Transportation Co.*, 783 F.2d 347, 350 (2d Cir.1986); *Gardner v. Federated Department Stores, Inc.*, 717 F.Supp. 136, 141, 142 (S.D.N.Y.1989), *aff'd in part, rev'd in part on other grounds*, 907 F.2d 1348 (2d Cir.1990); *437 Madison Avenue Associates v. A.T. Kearney, Inc.*, 120 Misc.2d 944, 466 N.Y.S.2d 931, 933–34 (N.Y.Civ.Ct.1983), *aff'd*, 127 Misc.2d 37, 488 N.Y.S.2d 950 (App.Term 1985); *Skaria v. State*, 110 Misc.2d 711, 442 N.Y.S.2d 838, 842 (Ct.Cl.1981); Restatement (Second) of the Law of Torts § 918(1); Restatement (Second) of the Law of Contracts § 350.

■ Failure to mitigate damages is applicable in the U.C.C. context. In *Pulaski Bank & Trust Co. v. Texas American Bank/Fort Worth, N.A.*, 759 S.W.2d 723 (Tex.Ct.App.1988), for example, a depository bank sued a collecting bank and others for damages resulting from the alleged late return of a check. The court held that the plaintiff could have recovered approximately $46,000 if it had frozen funds in the account in question after the check was returned. Since it failed to do so, its recovery against the collecting bank was diminished by that amount. *Id.* at 735–36; *see also Met Frozen Food Corp. v. National Bank of North America*, 89 Misc.2d 1033, 393 N.Y.S.2d 643, 649 (Sup.Ct.1977).

■ Lund and Montgomery failed to mitigate their damages after the sale of the subject planes on March 9, 1981. There is no question that they either knew or should have known that the aircraft were sold at the March 1981 closing. Yet neither one took any step with respect to the proceeds until later: in Montgomery's case, in De-

cember 1981 when the proceeds were applied to another transaction, and, in Lund's case, in June 1982 when the SEC commenced proceedings against FTC. Both compounded their own negligent acts by failing to timely recover the lost proceeds or notifying Chemical of the fraud. Instead of acting upon the fraud, they allowed Rubin to perpetuate it. Moreover, had either sought recovery when they should have, Chemical could have proceeded against its still solvent endorsing depositor. Having failed to mitigate their losses, neither is entitled to recover.

### Montgomery was not Damaged

 Montgomery was compensated by Rubin for his share of the Checks in a later transaction. Allowing him to recover from Chemical would therefore result in an unjust enrichment.

As recognized in *Atlantic Bank of New York v. Israel Discount Bank, Ltd.*, 108 Misc.2d 342, 441 N.Y.S.2d 315 (App.Term 1981),

> [w]here the proceeds of a forged check reach the intended payee, there can as a general rule be no cause of action by anyone on the forged endorsement. The payee cannot sue in conversion since he has suffered no damage—he has, after all, received the monies intended for him. The drawer may not sue the drawee-payor bank for an improper charge on his account because, again, no damage has been suffered as the funds have been put to their proper use.

*Id.* 441 N.Y.S.2d at 317–18 (citing *Hillsley v. State Bank of Albany*, 24 A.D.2d 28, 263 N.Y.S.2d 578 at 581 (1965)).

In applying this principle, the court in *Trans–American Steel Corp. v. Federal Insurance Co.*, 535 F.Supp. 1185 (N.D.Ga. 1982), refused to allow a judgment to be entered against a bank on checks that were fraudulently endorsed. The alleged forger apparently had paid the plaintiff an amount equal to the proceeds to which the plaintiff was entitled under the forged checks after the forgery had occurred. *See id.* at 1190. The court found that "[w]hether this payment is viewed as restitution by the alleged forger, or a flow-through of the proceeds to the intended payee, it was sufficient to reduce [the bank's] liability to zero." *Id.* at 1191.

Likewise, the court in *Twellman v. Lindell Trust Co.*, 534 S.W.2d 83 (Mo.Ct.App. 1976), concluded that U.C.C. § 3–419(2) does not prohibit a drawee form asserting as a defense that the plaintiff has been repaid by the alleged forger:

> [Section 3–419(2) ] was meant to prevent a defendant drawee from going beyond the face of the instrument in order to limit its liability. Any factors such as insolvency or other defenses such as inadequate consideration which would affect the value of the instrument, are not to be considered. This is not the situation in the present case. The "measure" of [drawee's] liability is the ... face amount of the instrument. Defendants [drawee and depository bank] do not argue that [the check] was, in fact, worth less due to any external factors. They are merely pointing out that plaintiff has already been partially reimbursed for his losses on the instrument. We do not believe that the statute should be read so narrowly as to prevent a set-off in the amount already recovered by plaintiff.

*Id.* at 96; *see also, e.g., Nutt v. Chemical Bank*, 231 N.J.Super. 57, 555 A.2d 8, 11 n. 4 (App.Div.1989) ("[I]f the payee had been fully or partially paid by a repentant forger, it would make no sense to require a second full payment by the drawee or its indemnitor, because the drawee or indemnitor failed to dishonor the check based upon the forged endorsement. The concept of unjust enrichment cannot be read out of the law by this section when there is no indication that the Legislature intended such a result.").

Montgomery contends that § 3–419(2) bars a drawee from asserting a "receipt of the proceeds" defense. This contention, while facially plausible, would abrogate settled commercial law if adopted. As the court in *Starkey Construction, Inc. v. Elcon, Inc.*, 248 Ark. 958, 457 S.W.2d 509 (1970), observed, it "appears to be the general rule in this country" to deny recovery

against a drawee in such a situation, and it seems unreasonable to assume that the code's drafters intended "to hold a drawee liable where the money actually reached the parties intended by the drawer of the check." *Id.* 457 S.W.2d at 513; *see also Hechter v. New York Life Insurance Co.,* 46 N.Y.2d 34, 412 N.Y.S.2d 812, 815, 385 N.E.2d 551, 554 (1978) (section 3–419 does not override common law principles not within its terms); *Barclays I,* 546 N.Y.S.2d at 481–82 (section 3–419 did not abrogate common law requirement of delivery as prerequisite to conversion action).

Montgomery gained full credit for the sale of the aircraft in the Joint Venture with Rubin in which he embarked in December 1981. His ultimate damage in fact resulted from the fraud in that venture, a fraud which, of course, could have been prevented had he not been negligent. Since he received credit for the proceeds of the Checks at issue here in that later transaction, he has been fully compensated for any loss resulting out of Chemical's behavior and cannot recover.

*Lund and Montgomery are Equitably Estopped*

Equitable estoppel is properly invoked when good conscience and honest dealing require doing so. *See, e.g., Robinson v. Pan American World Airways, Inc.,* 650 F.Supp. 125, 127 (S.D.N.Y.1986). The doctrine itself is not subject to "fixed and settled rules of universal application," but instead rests on the facts and circumstances of a particular case. *Id.*

Section 3–404 of New York's U.C.C. has specifically incorporated the common law doctrine of estoppel. Under it, an "unauthorized signature is wholly inoperative as that of the person whose name is signed unless [that person] ... is precluded from denying it". N.Y.U.C.C. Law § 3–404(1); *see Swiss Credit Bank v. Chemical Bank,* 422 F.Supp. 1305, 1312 (S.D.N.Y.1976); *accord Cooper v. Union Bank,* 9 Cal.3d 371, 107 Cal.Rptr. 1, 13–14, 507 P.2d 609, 618–19 (1973). Therefore, a principal's misplaced confidence in an unfaithful agent can cause the principal to be equitably estopped from challenging the

acts of the agent, even though the principal had no knowledge of the agent's fraud. *See Bunge Corp. v. Manufacturers Hanover Trust Co.,* 31 N.Y.2d 223, 335 N.Y.S.2d 412, 415–17, 286 N.E.2d 903, 906–08 (1972); *accord Cooper,* 107 Cal.Rptr. at 13–14, 507 P.2d at 618–19.

In *Cooper,* for example, the California Supreme Court held that a plaintiff's failure to discover its agent's defalcations estopped it from denying the operability of forged endorsements. The court explained:

> Plaintiffs' negligent failure to discover [their agent's] patent defalcations was directly responsible for defendant depositary banks' detrimental change of position in paying [the agent] the amount of the instruments. Defendants acted entirely in good faith, and, though their conduct with respect to certain of the instruments may have fallen somewhat below reasonable commercial standards, it was not sufficiently egregious to shift the balance of the scales in plaintiff's favor. For the purpose of this case, therefore, plaintiffs are precluded from denying the forged signatures are operative endorsements.

107 Cal.Rptr. at 14, 507 P.2d at 619.

Numerous actions and omissions of both Lund and Montgomery led to Rubin's actions at the March 1981 closing: they vested complete control of the aircraft bank accounts in Rubin; failed to examine their own bank statements and cancelled checks; failed to detect a prior alleged forgery; and allowed others to sign on their behalf on aircraft and FTC documents. Further, both failed to end the on-going fraud once they learned of it. Accordingly, Lund and Montgomery are estopped from recovering from Chemical under N.Y.U.C.C. § 3–404(1). *See Bunge Corp.,* 335 N.Y.S.2d at 415–17, 286 N.E.2d at 906–08.

*Conclusion*

Based on the findings and conclusions set forth above, judgment will be entered dismissing the complaints of Lund and

Montgomery with costs granted to Chemical.

It is so ordered.