OPINION OF THE COURT
Kaye, J.
This dispute concerns whether plaintiff customer or defendant bank should bear the loss for a series of checks forged by plaintiff’s bookkeeper and cashed by the bank. The result turns on the Uniform Commercial Code provisions for allocating the burden of proof of due care between a bank and its customer when each charges the other with negligence.
In December 1979, Putnam Rolling Ladder Company opened a checking account with Manufacturers Hanover Trust Company (MHT). Between February and December 1980, MHT paid out a total of 37 checks, amounting to $48,094, over signatures that purported to be those of Putnam’s officers. In reality, the signatures had been forged by Juanita Johnson, Putnam’s assistant bookkeeper. The checks were made payable to "Yolanda Wiggins,” an alias under which Johnson had set up a checking account. The long delay in discovering the forgery resulted from the fact that Putnam had assigned Johnson not only the duty of preparing company checks for signature but also the duty of reconciling its bank statements.
On December 8, 1980, 10 months after the defalcations began, Putnam notified defendant of the forged checks. This action, seeking to recover the $48,094 that defendant had allegedly negligently paid out over the forged drawer signatures, followed. MHT claimed in its answer to the complaint that Putnam had failed to exercise reasonable care and promptness in examining its bank statements and canceled checks, and was therefore precluded from asserting the forgeries against MHT.
At the bench trial that followed, the president of Putnam testified about the company’s bookkeeping procedures. As to MHT’s negligence, Putnam introduced into evidence five checks cashed by defendant during the same period the forged checks were cashed, each bearing only one signature, despite *344 the fact that Putnam’s corporate banking resolution required two.
Testifying for MHT, the manager of its bookkeeping division stated that a clerk compared each check that came into the bookkeeping center against the signature card on file; a clerk reviewed approximately 4,200 checks during a four-hour shift, allowing at most four seconds to inspect each check. The bank put in no evidence of clearing house rules or general banking usage with respect to check-clearing procedures. The bank’s only other witness was an accounting expert who opined that it was inadvisable for a company to permit the same person to issue checks and reconcile the statements.
Finding both parties negligent, the trial court applied comparative negligence principles and awarded Putnam half of its loss, after subtracting $4,357.20 repaid by the former bookkeeper. The court found that Putnam had been negligent in not promptly examining its bank statements as required under UCC 4-406 (1) and in entrusting the same employee with responsibility for issuing checks and examining bank statements. The court found MHT negligent in that the high volume of work in its check-clearing department "would prevent any realistic chance of detecting forgeries and other irregularities and amounted to a lack of ordinary care.” The court considered MHT's payment of checks with missing signatures further evidence of its failure to exercise reasonable care.
Both parties appealed — Putnam objecting to the trial court’s application of comparative negligence and MHT to the imposition of any liability on it.
The Appellate Division reversed and dismissed Putnam’s complaint, holding that Putnam had not sufficiently proved the bank’s lack of ordinary care in paying out the forged checks. The court held that plaintiff’s failure to establish that MHT’s check-review procedures were not consistent with clearing house rules or general banking usage, as provided by UCC 4-103 (3), was tantamount to failure to meet its burden of proving that defendant did not act with ordinary care. The court further found error in according any evidentiary value to the fact that defendant had paid out on five checks bearing only one signature, as that did not establish defendant’s negligence in paying checks with two signatures. Concluding that the Appellate Division erred in both respects, we now reverse.
*345 The UCC Scheme for Loss-Shifting
Articles 3 and 4 of the UCC envision a series of shifting burdens of risk of loss with respect to forged checks. Initially, the law places the risk of forgeries on the bank. A forged signature is "wholly inoperative as that of the person whose name is signed” (UCC 3-404 [1]), and therefore is not "properly payable”, and the bank cannot debit the depositor’s account (UCC 4-401 [1]). This is, of course, in accord with the pre-UCC theory of the relationship between a bank and its depositor as a debtor-creditor contract, under which payment of a forged check is a breach of the bank’s agreement to pay out funds only upon the customer’s authorization, for which the bank is strictly liable (see, Hartford Acc. & Indem. Co. v American Express Co., 74 NY2d 153, 164).
The UCC, however, imposes certain reciprocal duties on the customer. Failure to comply with those duties shifts the burden of loss from bank to customer. UCC 4-406 imposes upon a customer the duty to inspect its statement and canceled checks with reasonable care and promptness. Failure to do so results in preclusion of any claim against the bank for repeated forgeries by the same wrongdoer after the first such forged check and statement reflecting it are made available to the customer.[1] This rule reflects the fact that the customer is generally in a better position than the bank to prevent repetition of forgery. A skillful forgery may not be detected by even a careful bank inspector, but the customer to whom the canceled check and statement are returned should know whether or not it actually intended to authorize payment of its funds to the named payee (see, UCC 4-406, comment 3). Thus, the shifting burden of loss is intended as well to encourage the parties to use reasonable care in situations where, from a systemic point of view, that is the efficient loss-avoidance mechanism.
Finally, UCC 4-406 (3) shifts the loss of even repeated forgeries back to the bank when the customer, although in *346 breach of its own duty to inspect its canceled checks and statements, is able to establish that the bank lacked ordinary care in paying the forged checks. As that section provides: "The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s).” By reallocating the burden of loss to the bank the Code thus encourages proper business practices on the part of banks as well as their customers.
Under UCC 4-406 (3), as comment 4 to that section underscores, the customer who wishes to invoke the exception to UCC 4-406 (2) preclusion bears the burden of establishing that the bank also acted without ordinary care in paying the items. Section 4-406 does not, however, define ordinary care, nor do the Official Comments specify what the customer is to prove or how. Instead, ordinary care in article 4 generally is discussed in the Official Comments to section 4-103, where it is noted that "ordinary care” is used "with its normal tort meaning and not in any special sense relating to bank collections.” (UCC 4-103, comment 4.) It would appear, therefore, that a customer could prove a bank lacked ordinary care by presenting any type of proof that the bank failed to act reasonably. In this case, plaintiff adduced such proof, to the satisfaction of the trier of fact, in the form of evidence that MHT’s inspection procedures were so superficial as to offer no realistic opportunity to detect forged checks.
Contrary to the view of the Appellate Division, evidence that MHT had — contemporaneously and, according to its own testimony, using the identical, routine procedures — paid five facially defective checks was also admissible and probative on this point. While such evidence might not be admissible or probative to show a similar act occurred on a subsequent occasion, that was not the theory on which this evidence was considered by the trial court. Rather, it was an application of the settled rule that where other injuries occur under the identical conditions as the injury in suit, those other injuries may be proved for the purpose of showing that the condition was unsafe (see, Richardson, Evidence § 196 [Prince 10th ed]; McCormick, Evidence § 200 [3d ed]). In attempting to show that MHT’s check-processing methods were not reasonable, the trial court thus properly permitted plaintiff to prove that, during the period in issue, the very same bank procedures had been insufficient to allow bank employees to spot obviously defective checks, and the Appellate Division erred in rejecting that evidence.
*347 Burden of Proof Under The "Safe Harbor” Provision
Defendant argues that regardless of whether Putnam presented evidence of lack of ordinary care sufficient under normal tort principles, the UCC required it in addition to present a special kind of evidence concerning defendant’s banking practices: that the methods by which MHT had paid its checks did not conform to clearing house rules or a general banking usage. This contention centers on UCC 4-103 (3) — a "safe harbor” provision — which in pertinent part states that "in the absence of special instructions, action or non-action consistent with clearing house rules and the like or with a general banking usage not disapproved by this Article, prima facie constitutes the exercise of ordinary care.” Defendant contends — and the Appellate Division explicitly held — that disproof of the "safe harbor” factors in UCC 4-103 (3) is a necessary part of the plaintiffs direct case against the bank for failure to exercise ordinary care. We disagree.
UCC 4-103 (3) allows and even encourages banks to conform their practices to those in general use in the industry by providing that observance of such practices or rules "prima facie” constitutes the exercise of ordinary care. Indeed, to some extent this section compensates for what may be perceived as an unfairness inherent in the loss-shifting scheme of sections 4-406 and 3-406. Under those sections, when both the bank and its customer have been negligent — and even when the customer is by far the more negligent party — the entire loss may still be asserted against the bank (see, Phillips, The Commercial Culpability Scale, 92 Yale LJ 228, 240, n 62 [1982]). The "safe harbor” provision mitigates the harshness. Merely by showing that it acted in accordance with general banking rules or practices, a bank can ensure that its conduct at least prima facie meets an ordinary care standard.
While section 4-103 (3) is silent as to which party bears the burden of proving clearing house rules or general banking usage, we conclude that the burden should rest on the bank— the party seeking the advantage offered by the provision — not on the customer.
First, the bank is by far in the better position to come forward with proof on this issue. It knows its own practices, and is surely better situated than the customer to be aware of how those practices compare to those of other banks. In fact, given the breadth of what can qualify as "general banking usage” (see, UCC 4-103, comment 4), it is at the least ineffi *348 cient to impose on the customer the burden of disproving all these possibilities, in the absence of any indication on the bank’s part of which general practices support its own.
Moreover, the "prima facie” language of 4-103 (3) itself suggests that conclusion. Generally, a party makes out its own prima facie case, leaving rejoinder for the adversary. It is both awkward and purposeless to require plaintiff to establish the existence of relevant rules and usage, and then to demonstrate either that defendant’s action was inconsistent with them or that the rules and usage were unfair or unreasonable (UCC 4-103, comment 4). Unless a defendant advances a genuine issue on this point, it is unnecessary and potentially confusing to ask a plaintiff to make both sides of the issue. In addition, a general banking usage is a species of trade usage (UCC 1-205 [1]), and the burden of proving a trade usage has generally been placed on the party benefiting from its existence (see, 1 White & Summers, Uniform Commercial Code § 3-3, n 42, at 140 [Practitioner’s-3d ed]).
Thus, we conclude that the Appellate Division erred in charging plaintiff for the failure to prove that MHT’s check-review procedures were not consistent with clearing house rules or general banking usage. That was the bank’s burden. The bank adduced no such evidence, thus failing to establish its entitlement to the "safe harbor” of UCC 4-103 (3).
Comparative Negligence
While the Appellate Division erred in reversing the trial court on proof of due care, that error cannot be rectified simply by reinstating the trial court judgment, which applied comparative negligence principles and divided the loss.
The importation of comparative negligence into the UCC —which was drafted before widespread acceptance of comparative fault — is not without its advocates (noted in, 1 White & Summers, op. cit., § 16-7, n 6, at 809), but has generally been rejected by both courts and commentators (id.). We agree. As one court stated in addressing this issue, "the balancing of rights under the UCC represents the ultimate distillation of a painstaking process of evolution, pursuant to which the risk of loss in commercial matters has been attempted to be adjusted in a fair and equitable manner.” (Five Towns Coll. v Citibank, 108 AD2d 420, 429-430; see also, United States Fid. & Guar. Co. v Federal Reserve Bank, 620 F Supp 361.) It is not for the *349 courts to unsettle the UCC’s carefully drawn balance by introducing comparative fault principles taken from tort law.
Moreover, the UCC serves an important objective not shared by the law of torts (see, by analogy, Board of Educ. v Sargent, Webster, Crenshaw & Folley, 71 NY2d 21, 29). Unlike tort law, the UCC has the objective of promoting certainty and predictability in commercial transactions. By prospectively establishing rules of liability that are generally based not on actual fault but on allocating responsibility to the party best able to prevent the loss by the exercise of care, the UCC not only guides commercial behavior but also increases certainty in the marketplace and efficiency in dispute resolution. These ends would not be furthered by the introduction of the sort of fact inquiries necessitated by comparative negligence.
In that plaintiff adduced sufficient evidence of the bank’s lack of ordinary care in paying the 37 forged checks (thereby avoiding preclusion under UCC 4-406 [2] for its own negligence), and the bank offered no evidence whatever of general rules or usage, judgment should have been awarded to plaintiff in the undisputed amount of its loss.[2]
Accordingly, the Appellate Division order should be reversed, with costs, and judgment granted for plaintiff in the amount of $43,737.02, with interest from December 9, 1980.
Chief Judge Wachtler and Judges Simons, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
Order reversed, with costs, and judgment granted for plaintiff in accordance with the opinion herein.

. UCC 4-406 (2) (b) provides: "If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank * * * (b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.”

. The parties in their briefs assume a timely claim and discuss only the duty of care question, with passing reference in a footnote to an alleged condition precedent requiring the customer to notify the bank of statement irregularities within 14 days and commence suit within one year. This time bar is contained in a bank form entitled "Banking Resolutions,” signed by the customer and apparently in wide use by the banking industry. Defendant’s footnote simply declares that the resolution is an absolute defense, and plaintiffs footnote in reply simply declares that the provision is unenforceable (as the trial court held). We confine our decision to the only question briefed by the parties in this court — the duty of care — noting particularly that the time-bar question raises policy considerations with potentially broad ramifications (see, 1 White & Summers, Uniform Commercial Code § 18-2, at 869-873 [Practitioner’s-3d ed]), properly reserved for an appeal where the parties put that question before us for resolution. By the same token, no question is raised with respect to any causal connection that must be shown between a bank’s negligence and its payment of forged checks.