**ZAMBIA NATIONAL COMMERCIAL BANK LIMITED, Plaintiff,**

v.

**FIDELITY INTERNATIONAL BANK, Defendant.**

### No. 91 Civ. 8747 (BN).

United States District Court, S.D. New York.

June 28, 1994.

Nixon, Hargrave, Devans & Doyle, New York City (Robert C. Sentner, Matthew Tracy, of counsel), for plaintiff.

McCarter & English, Newark, NJ (William D. Wallach, of counsel), for defendant.

## OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge:[1]

Zambia National Commercial Bank Limited ("Zambia National") brings this action against Fidelity International Bank ("FIB"), alleging negligence, breach of contract and conversion in connection with FIB's payment of two forged and counterfeited checks, and seeking to recover $345,649.60, the sum of the two forged checks that were drawn on its account at FIB. The relationship between the parties is governed by the relevant provisions of the New York Uniform Commercial Code (the "U.C.C.").

This matter arises under the court's diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a). A bench trial was held from April 12 to 14, 1994. The following constitute the court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P.Rule 52(a).

## THE RECORD

Zambia National produced the following witnesses: William Holman, the Director of Inspection, Audit and Investigations for Zambia National; Alfred Kumwenda, a former section accountant in the International Banking department at Zambia National; Rose DeGregorio, former manager of the Demand Deposit Accounting area at FIB; and Consuelo Piedrahita and Dietra Jones, the FIB clerks responsible for verifying signatures. Zambia National also offered the deposition testimony of Grace Silumesi, who worked with Kumwenda at Zambia National.

FIB produced the following witnesses: Richard Bendit, the account officer at Fidelity responsible for the Zambia National account; Carl Schaffenberger, a handwriting expert; Joseph Santiso, an expert in bank operations; and Michael McDevitt, Assistant Vice President of FIB.

## FINDINGS OF FACT

■ Before pronouncing its findings in this matter, the court observes for the purpose of clarity that under the U.C.C., a person is not liable on an instrument of commercial paper unless he signs it. *See* U.C.C. § 3–401(1). Moreover, even if the signature appearing on a check is not a forgery, the instrument upon which it appears may not be "properly payable", U.C.C. § 4–401, if the signature is made outside the scope of the authority of a person purporting to sign for a customer. *See* Thomas M. Quinn, UNIFORM COMMERCIAL CODE COMMENTARY AND LAW DIGEST, § 3–404[A] at 3–157 (1987 & 1991 Supp.). The term "forgery", therefore, does not capture every variety of "unauthorized signature". It is the term "unauthorized signature", and not "forgery" which is used by the drafters of the U.C.C. to describe the condition pursuant to which a customer may deny the validity of a signature and demand a recredit to his account. For convenience, however, the court here uses the words "forgery" and "unauthorized signature" interchangeably.

*Zambia National's Check Writing Procedure:*

Zambia National is an African bank with its principal place of business in Lusaka, Zambia. FIB is a New York bank maintaining its principal place of business in New York City. First Fidelity Bank, N.A., New Jersey ("FFB") is a national bank maintaining its principal place of business in Newark, New Jersey. FIB and FFB, along with Fidelity Bank of Philadelphia, are wholly

---

1. Bernard Newman, Senior Judge of the United States Court of International Trade, sitting as a United States District Judge by designation.

owned subsidiaries of First Fidelity Bancorporation.

During 1988, George Thomas, Richard Bendit and other representatives of FIB visited Zambia National in Lusaka to discuss the possibility of Zambia National's opening an account at FIB in the United States. Zambia National maintained foreign bank accounts in order to pay certain expenses of Zambian citizens overseas, including import/export transactions and small bills requiring payment in hard currency. In November 1988, Zambia National opened Account Number 18028 at FIB in New York.

Payments were made from Zambia National's account by either of two means. Large sums, i.e., amounts over $10,000 or $20,000, were paid either by letter of credit or by "tested telex", a form of wire transfer authorizing FIB to pay money from a customer's account.[2] Where such sums were involved, telex payment was preferable from the point of view of the payee because it permitted speedy payment and the opportunity to earn interest at an earlier time than would be possible if the payment were made by check. According to Holman, large sums were paid almost exclusively by telex, with the particular exception of one customer, the Zambia State Insurance Company, which always paid its reinsurance premiums by check. Relatively small amounts, typically not exceeding $10,000 to $20,000, were paid by check.

Since Zambia had strict foreign exchange controls, most payments from Zambia National's foreign accounts were preceded by extensive paperwork. First, the bank required the customer to furnish invoices and other documentation from or concerning the payee. Zambia National also required a certification from the Zambian high commissioner in the country where the foreign currency payment was required. Then, the bank would forward the invoice and related documentation to the Zambian central bank, with an application for permission to pay out funds from the foreign account.

Once approval was obtained from the central bank, Zambia National would prepare a draft. Zambia National maintained a stock of blank checks in the vault of the Lusaka main branch. Checks were withdrawn one at a time, in sequential number order, each time a foreign exchange transaction was approved for payment. The date of withdrawal, and the person to whom the check was issued, was noted in a register. *See* Plaintiff's Exhibit 2. During the period 1985 through 1991, Zambia National issued checks within the range of check numbers 251101 through 302300. The numbers of the two checks at issue were outside that amount, suggesting that the forger counterfeited the checks while working from old, canceled checks.

Zambia National arranged to have its blank drafts printed locally by a Zambian firm called Associated Printers, and Zambia National engaged that same company to prepare the authorized signatures lists for use by the correspondent banks. At the time the account at FIB was opened, FIB recommended that Zambia National use checks supplied by FIB's printers in order to facilitate account reconciliation. Such checks would be precoded with a microcoding line, which allows a computer system to print the check number on the customer's statement, in addition to the notation of "check" and the dollar amount paid. However, Zambia National was unwilling to incur additional expenses because it had already purchased its drafts from Associated Printers.[3]

2. A tested telex contains a secret code number known only to the sender and receiver of the telexed message. The code is derived from test keys, which are documents kept under the control of two persons, both of whom must be present in order to retrieve the test keys. It was established at trial that the test key system was compromised, and that a tested telex in September 1990 was transmitted from the Zambia National wire room operators, authorizing payment of $265,000 to United Derby Mills, the same payee that was named in the two checks at issue. Zambia National did not discover this payment until the London fraud squad alerted them to the fraud in October 1990. The wire operators were discharged, and Zambia National never recovered the stolen funds.

3. In the spring of 1990, subsequent to the payment of the two checks at issue, Zambia National moved its account from FIB New York to FFB in Newark, New Jersey. The move was at FIB's suggestion, because the volume of checks being paid through the FIB account was greater than anticipated and FFB might serve Zambia Nation-

Checks required two authorized signatures. Once retrieved from the vault, a blank draft was completed by a typist, reviewed against the information appearing in the application for payment, and signed by the section accountant. The draft, thus prepared and authorized, was then forwarded to a second person, who would reverify the same details and sign the check. Checks thus approved were then forwarded to the customer.

*Check Verification at FIB:*

Before charging customer accounts, FIB followed a procedure which called for verifying the authenticity of signatures appearing on checks presented for payment. To this end, FIB maintained in its files at 520 Madison Avenue, in New York City, an Authorized Signature List (the "signature list"). The list was provided by Zambia National for use by FIB's personnel. The department at FIB responsible for signature verification was the Demand Deposit Accounting ("DDA") area, of which Rose DeGregorio was the manager. At all times relevant to the instant case, the signature list on file with the DDA area contained specimen signatures of Alfred Kumwenda and Grace Silumesi, who were employees in the International Banking Department at Zambia National, and were responsible for issuing checks against the bank's overseas accounts. The two checks at issue in this action bore the forged signatures of Alfred Kumwenda and Grace Silumesi.

At the time when the forged, counterfeited checks were paid, the DDA area had on file a signature list from Zambia National dated December 1986. On several occasions prior to the payment of the two checks at issue, FIB attempted to obtain an updated signature list from Zambia National. First, on November 17, 1989, DeGregorio dispatched a telex to Zambia National in connection with an unauthorized signature on one of Zambia National's checks in the amount of $204,611.70. *See* Defendant's Exhibit I. FIB requested that Zambia National forward an updated list of authorized signatures, concluding its message with the phrase, "matter most urgent." Thereafter, on December 13,

1989 and again on January 10, 1990, FIB sent similar telex messages in connection with other signatures the validity of which FIB could not confirm. *See* Defendant's Exhibit J, K. Finally, by letter dated March 19, 1990, FIB itemized a list of checks that it was returning to Zambia National because the signatures could not be confirmed. *See* Defendant's Exhibit L. Once again, FIB sought an updated signatures list. None of the aforementioned checks were forged and they were paid in due course.

Indeed, it was not until August 1, 1990—more than eight months after the first request—that Zambia National provided an updated list of signatures. *See* Plaintiff's Exhibit 1. By this time, Zambia National had been alerted that someone was forging the signatures of the employees who were authorized to sign checks; accordingly, when supplying exemplars for the August 1, 1990 list, Kumwenda changed the way in which he signed his name. This precaution was, of course, too late to prevent the two forged signatures at issue here from passing examination by FIB.

From 1989 through 1990, Dietra Jones and Consuela Piedrahita were the FIB employees in the DDA area primarily responsible for comparing the signatures of customers on checks drawn against FIB's customers' accounts with the signatures appearing on the customers' authorized signature lists. However, in January 1990 Piedrahita was temporarily reassigned to other duties due to pregnancy complications. The following month, Piedrahita took maternity leave and did not report back to the DDA area until May 1990.

During an ordinary business day, DDA received checks drawn by its depositors, including Zambia National, from the clearinghouse in the afternoon. Upon receiving the check, FIB posted the check to the customer's account and entered a provisional debit on the account. The checks were sorted and prepared for signature verification, which took place the following morning.

According to FIB's operating procedures governing signature verification, the DDA clerk was required to compare the signatures

al's needs better. Zambia National did purchase

its drafts for the new account through FIB.

appearing on checks with the exemplars in the customer's authorized signature list in cases where (1) the check was payable to a corporation or bank in an amount equal to or exceeding $3,000 and was issued by a foreign customer; (2) the check was payable to an individual in an amount equal to or exceeding $500 and was issued by a foreign customer; or (3) the check was issued by a domestic customer irrespective of the amount. If the clerk determined that the signatures appearing on the check compared favorably to the exemplar in the signature list, she would place an unsigned verification stamp on the check. The stamp recited: "We certify that the above signature compares favorably to that in our files." If the clerk determined that a given signature was questionable, she would bring the check to the attention of Rose DeGregorio before placing the stamp on the check.

According to Jones, the task of comparing signatures was the most time consuming part of her work day. Jones testified, however, that after a few months on the job, she became more proficient and usually spent approximately 30 to 45 minutes per day verifying checks before turning them over to DeGregorio for approval, although the job could take longer, depending upon the number of signatures she was required to verify. On an average day in 1990, the DDA area was responsible for verifying the signatures appearing on at least 100 checks. The evidence also established, however, that during the period in question there was a higher volume of checks than usual and the task of signature verification could consume the entire morning. *See* Record at 246, 257, 265.

Zambia National placed in issue the question of Jones' job performance. Plaintiff consequently produced FIB's periodic job evaluation form for the period of June 1990 through June 1991, which characterized her job performance as generally standard, while noting some areas that required improvement. *See* Plaintiff's Exhibit 12. However, FIB produced the job evaluation for the period covering the payment of the two checks at issue, which period ranged from June 1989 through June 1990. *See* Defendant's Exhibit F. This latter evaluation described Jones'

performance as "high standard" and praised the accuracy of her work. Based on the testimony and the evidence, the court is not persuaded that the evidence of Jones' performance during a later period, while relevant, detracts greatly from the weight of FIB's evidence on this point. The court accordingly concludes that, whatever may have happened to Jones' job performance in the review period following the date when the two checks passed through DDA, Jones was carrying out her assigned duties with at least normal care and efficiency during the period in question.

DeGregorio was responsible for reviewing all checks before signing her name on the approval stamp. In cases where the clerk questioned a signature, DeGregorio independently checked the signature against the corresponding exemplar in the authorized signature list. The procedure thus described comports with the requirements of FIB's operations manual governing check verification. *See* Defendant's Exhibit H. In fact, DeGregorio exceeded the requirements contained in the procedures manual to the extent that she personally referred to the signature list, not only when the clerk questioned a signature, but also when DeGregorio did not find a given signature to be familiar. Record at 197, lines 2 through 13.

Zambia National originally arranged to receive account statements from FIB on a weekly basis, delivered by airmail. Defendant's Exhibit M. According to Holman, it took two to three weeks for mail to arrive in Lusaka. In March 1989 the account instructions were changed. From that time forward, FIB sent to Zambia National a daily summary of account activity by telex, i.e., on the date that the account was debited. Defendant's Exhibit N. In conformance with Zambia National's request, as of June 1989 the daily telex was routed to a specific location within Zambia National's International Banking Department. FIB transmitted all telexes to its customers from London. If a telex did not go through, an FIB officer in London was responsible for contacting FIB in New York. FIB continued to send account statements and the corresponding canceled checks to Zambia National via airmail,

although these statements were now transmitted on a daily basis. Thus, at all times relevant to this action, Zambia National had at its disposal the means to track account activity on a daily basis.

*The Forged Checks and the "March" Checks:*

On January 16, 1990, FIB made provisional debits to accounts for checks presented for payment. Among them was the first of the two forged and counterfeited checks which form the basis of the instant action. This first counterfeited check bore the number 167690, dated December 28, 1989, and was payable to United Derby Mills Property in the amount of $147,694 ("the first check"). The signatures appearing on the check were compared by FIB with the signature list and found to compare favorably with the specimen signatures of Kumwenda and Silumesi. The check was thus approved for payment on January 17, 1990 and Zambia National's account was charged $147,694.00. Thereafter, FIB mailed the daily statement for January 16, 1990, including the $147,694 draft, to Zambia National. The statement and enclosed checks were received by Zambia National on February 9, 1990.

The January 16 statement recited payment of fourteen checks designated by the symbol "CK". The checks were payable in amounts ranging from $56 to $19,000, with the exception of the $147,694 check bearing unauthorized signatures. *See* Plaintiff's Exhibit 3.

On February 28, 1990, FIB sent a telex message to Zambia National, questioning whether two checks presented for payment were in fact authorized. Zambia National requested that FIB forward photocopies of the front and back of each of the two checks. *See* Defendant's Exhibit A (the "March checks"). The March checks were denominated in the amounts of $6,000 and $46,000, and each check bore what purported to be the signature of Alfred Kumwenda. Although Holman could not recall with certainty whether Zambia National ever determined the March checks to be forgeries, it should be recalled that Kumwenda's signature was known to have been forged prior to August 1990, and as discussed *supra,* said forgery occasioned an update of Zambia National's signature list. Further, the investigation

into the March checks was conducted over a period of at least two months. Holman further testified that Zambia National subsequently changed its operating procedures with regard to the account at FFB. Specifically, in response to the March checks, and similarly with regard to one other check that had come to Zambia National's attention, Zambia National undertook in the middle of 1990 to monitor all transactions in the account. FFB was not even responsible for verifying signatures on the checks. *See* Record at 63–69.

Zambia National did not, however, take steps in March to prevent further forgeries of Kumwenda's signature, or otherwise monitor account activity by referring to the daily telex. Nor did it choose at that time to submit a new signature list.

On April 2, 1990, FIB debited Zambia National's account in the amount of $197,-955.60, representing the second of the two counterfeited and forged checks in this action ("the second check"), numbered 167704 and dated March 7, 1990, likewise payable to United Derby Mills Limited. On April 3, 1990, FIB verified the signatures against the specimens on file, and paid the check. Thereupon, FIB mailed the April 2, 1990 statement, including the $197,955.60 check, to Zambia National.

As with the January 16 statement, the check for $197,955.60 was, conspicuously, very large in relation to the other checks paid on that date, which were payable in the range of $250 to $4,757. *See* Plaintiff's Exhibit 4.

The court finds that the forged signatures compare favorably with the genuine signatures of Kumwenda and Silumesi, and that under its operating procedures FIB was reasonable in making that determination. Although the signatures appearing on each of the counterfeit checks are forgeries, a comparison of the forged signatures with the exemplars provided in Zambia National's authorized signature list reveals that the forgeries closely resemble the authentic signatures. It is noteworthy that defendant's handwriting expert, Schaffenberger, indicated that he required several hours to confirm

that the signatures were forgeries. Additionally, he characterized the signatures as "facsimiles," which he explained to mean that they "are the same [as genuine signatures] in general appearance". Record at 343–344.[4] Likewise, while the checks are counterfeits, their deviation from the design of genuine checks can only be discerned after very careful comparison to the real article.

As to both checks, the court finds that FIB transmitted the daily account information for January 16 and April 2, respectively, to Zambia National by telex in accord with its usual business practice. Although FIB had sent the relevant account information on the dates in question, the telex was not found, and Zambia National suggests that it was never sent. The court finds that the telex was sent and received. Either the International Banking Department: did not check the telex upon arrival; lost track of the telex; or, it failed to take steps to verify that the amounts recited in the telex statement were in fact authorized to be paid.

*Review of Account Statements and Canceled Checks:*

According to Holman, Zambia National recorded the receipt of all items of mail, including bank statements, in a central register. Bank statements were then forwarded to International Banking, where they were reviewed on arrival by the Director, one Tim Daka.

International Banking had its own routine practice regarding the daily receipt and disposition of mail. Upon receiving bank statements, Daka's secretary opened the statements and placed them on Daka's desk. Daka routinely looked through the statements and examined the contents. Thereupon, Daka forwarded the statement to the Reconciliation Department, which recorded its receipt of the statements on a second register maintained by International Banking. Although Daka was neither deposed nor offered as a live witness to testify concerning his examination of the statements containing the two forged checks, the court infers from Holman's testimony that on the two days in question, Daka's conduct was in conformity with his routine practice, and that Daka did in fact examine those statements and the enclosed checks. Fed.R.Evid. 406.

It must be recalled here that the sums paid over the two forged signatures far exceeded the amounts normally paid by check. Significantly, neither Kumwenda nor Silumesi ever signed any checks in excess of $10,000. Indeed, checks ordinarily were not paid much in excess of that amount; they were virtually always paid by wire transfer or by letter of credit. Daka did not make inquiries upon reviewing those checks when he first saw them in his office in Lusaka, or communicate to FIB that the checks had been paid over unauthorized signatures. Rather, he passed them on to the Reconciliation Department. According to Holman, the Reconciliation Department was routinely four to five months behind on its reconciliation of Zambia National's accounts. As it happened, neither of the two checks at issue were discovered to be forged during the reconciliation stage.

*Zambia National Discovers the Forged Checks:*

In early October 1990, Zambia National notified FFB of the existence of four checks bearing unauthorized signatures, all dated during the month of September and drawn against Zambia National's account at FFB ("the September forgeries"). Those checks were as follows:

| | | |
|---|---|---|
| Check no. 5450 | $389,000.17 | Sept. 3, 1990 |
| Check no. 5451 | $365,000.28 | Sept. 5, 1990 |
| Check no. 5452 | $422,000.71 | Sept. 7, 1990 |
| Check no. 5453 | $482,500.26 | Sept. 11, 1990 |

*See* Defendant's Exhibit C. The third draft, in the amount of $422,000.71, was payable to United Derby Mills, the same payee named on the two checks at issue in this action. FFB then advised the presenting banks in Canada and the United Kingdom, to much effect. Zambia National presented affidavits of forgery relating to the September forgeries. It appears that FFB and the presenting banks were able to recover all but $80,000 from the accounts into which the converted funds had been deposited.

---

**4.** Schaffenberger stated, "These were not shots in the dark. At the very least, the person that signed these signatures knew what the real signature looked like." Record at 343.

It was not until after the September forgeries had been discovered that Daka and his staff, by this point alarmed by the possibility of more forged signatures on other Zambia National checks, searched through the January 1990 and April 1990 bank statements from FIB. Daka then "spotted" the two checks that form the basis of the instant action, and discovered that they likewise bore unauthorized signatures. Zambia National thereupon notified FIB by telex that the two checks contained unauthorized signatures. *See* Plaintiff's Exhibit 8.

Upon receiving Zambia National's telex, Bendit notified Barclays Bank, the presenting bank, of the existence of the two checks and the unauthorized signatures. Bendit further requested that Barclays freeze the accounts into which the two forged checks had been deposited. However, it was discovered during court proceedings in London on or about October 12, 1990 that the funds relating to the two forged checks at issue had been withdrawn from the Barclays accounts, and there was nothing available to attach.

Zambia National requested that FIB refund its account in the amount of the two checks at issue. FIB refused.

Zambia National forwarded four affidavits of forgery to FIB on November 6, 1990. Kumwenda and Silumesi each provided separate affidavits for the two checks at issue. However, because one of the affidavits incorrectly recited the dollar amount appearing on a check, it was not until January 1991 that FIB finally was able to send properly executed affidavits to Barclays Bank. Again, Barclays advised FIB that the account into which Zambia National's funds had been paid did not contain any funds that could be attached by Zambia National. This action followed.

## DISCUSSION

### I.

■ The starting point in the court's analysis of this matter is the principle that "[n]o person is liable on an instrument unless his signature appears thereon." U.C.C. § 3–401(1). An unauthorized signature, including a forged signature, is "wholly inoperative as that of the person whose name is signed", U.C.C. § 3–404(1). And while a bank may debit a customer's account when an instrument is "properly payable", U.C.C. § 4–401, it has been held implicit in the statute that the bank may not charge an account where the instrument is *not* "properly payable", *i.e.,* when the signature appearing on the instrument is unauthorized. *See G & R Corp. v. American Sec. & Trust Co.,* 523 F.2d 1164, 1169–70 (D.C.Cir.1975). It follows that in cases where a bank pays a forged check and debits a customer's account, the customer is entitled under the U.C.C. to have the account recredited by the bank. *Id. See also, Tonelli v. Chase Manhattan Bank, N.A.,* 41 N.Y.2d 667, 670, 394 N.Y.S.2d 858, 860, 363 N.E.2d 564, 566 (1977). Thus, the Uniform Commercial Code places the initial risk of loss from a forgery on the bank and not on the customer whose signature is forged. *See Putnam v. Manufacturers Hanover Trust,* 74 N.Y.2d 340, 345, 547 N.Y.S.2d 611, 613, 546 N.E.2d 904, 906 (1989).

It is undisputed that the two checks at issue were paid over forged signatures and hence, that Zambia National did not authorize FIB to charge its account. Under the legal framework set forth above, Zambia National asserts that, as to the first of the two checks at issue, the U.C.C. entitles it to an automatic recredit of the account.

But that is not the law. The U.C.C. recognizes several conditions which will shift the risk of loss to the customer: negligence of the customer substantially contributing to the forgery (U.C.C. § 3–406); ratification (U.C.C. § 3–404); and failure to examine bank statements in a timely manner (U.C.C. § 4–406). For the reasons set forth below, the court holds that none of these three defenses avail FIB in connection with the first of the two checks at issue. However, FIB's defense of negligence pursuant to U.C.C. § 3–406 does preclude Zambia National's claims concerning the second check.

### II.

■ Initially, the court considers FIB's contention that Zambia National is precluded from asserting the forgeries and obtaining a

recredit to its account because Zambia National was negligent and thereby substantially contributed to the making of the unauthorized signatures. The elements of this defense, as to which FIB bears the burden of proof, are provided in § 3–406 of the U.C.C., which states:

> Any person who by his negligence *substantially contributes to* a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business. (Emphasis added).

This section creates an estoppel by which a plaintiff will be precluded from asserting an unauthorized signature or alteration against a defendant bank, provided that the bank establishes: (1) that the plaintiff by its negligence *substantially contributed to the making of the unauthorized signature* and (2) that the bank was not itself in any measure contributorily negligent. The statute does not supply a definition of negligence that would support a defense under § 3–406. The official commentary to the U.C.C. indicates that the question of whether the drawer failed to exercise ordinary care and thereby substantially contributed to the forgery is a question for the finder of fact, to be decided on a case-by-case basis. U.C.C. § 3–406, Comment 7 (McKinney 1991).[5] *See also, Chicago Heights Currency Exchange, Inc. v. Par Steel Products and Service Co., Inc.,* 123 Ill.App.3d 1054, 79 Ill.Dec. 275, 463 N.E.2d 829 (1984) and authorities there cited.

It should be observed at the outset that U.C.C. § 3–406 addresses negligence that is antecedent to the making of the unauthorized signature. Consequently, this section is distinguishable from U.C.C. § 4–406, which provides a similar preclusion concerning the customer's conduct subsequent to the forgery, i.e., where the plaintiff was negligent by virtue of his failure to examine the account statement and canceled checks in a timely manner. *See* Ronald A. Anderson, UNIFORM COMMERCIAL CODE, § 3–406:22 at 425 (1993 rev.).

Additionally, under § 3–406 the bank must establish not merely that the customer was careless, but that the customer's negligence set the stage for, or in some way provided the wrongdoer with the opportunity to make the unauthorized signature. In this respect, the U.C.C. departs from the common law notion of proximate cause in favor of a more expansive standard, whereby the customer is estopped from asserting the forgery if his negligence bears a causal relationship to the forgery. *Fidelity & D. Co. of MD. v. Chemical Bank of N.Y.T. Co.,* 65 Misc.2d 619, 318 N.Y.S.2d 957, 959 (N.Y.App.Term 1970), *aff'd,* 39 A.D.2d 1019, 333 N.Y.S.2d 726 (1972).

■ Proof of the plaintiff customer's negligence is not sufficient to establish a successful estoppel under U.C.C. § 3–406. The defendant bank seeking refuge in § 3–406 must also establish that it was not contributorily negligent, i.e., that it exercised "reasonable commercial standards" in verifying signatures on the checks presented to it for payment. The term "reasonable commercial standards" is synonymous with the concept of "ordinary care" contained in § 4–103(3), which provides, in relevant part:

> "action or non-action consistent with clearing house rules and the like or with a general banking usage not disapproved by this Article, prima facie constitutes the exercise of ordinary care."

Although the language of sections 3–406 and 4–103(3) is not identical, courts have treated "reasonable commercial standards" and "the

---

5. The commentary states, in relevant part:
 "The section applies the same rule to negligence which contributes to a forgery or other unauthorized signature, as defined in this Act (Section 1–201). The most obvious case is that of the drawer who makes use of a signature stamp or other automatic signing device and is negligent in looking after it. The section extends ... to cases where the party has notice that forgeries of his signature have occurred and is negligent in failing to prevent further forgeries by the same person.... As in the case of alteration, no attempt is made to specify what is negligence, and the question is one for the court or the jury on the facts of the particular case."

exercise of ordinary care" as equivalents. *See, e.g., Rhode Island Hosp. Trust Nat. Bank v. Zapata Corp.*, 848 F.2d 291, 293 (1st Cir.1988) and authorities there cited. *See also, Five Towns College v. Citibank, N.A.*, 108 A.D.2d 420, 489 N.Y.S.2d 338, 344 (1985); *Cf. Lund v. Chemical Bank*, 797 F.Supp. 259, 269–70 (S.D.N.Y.1992) (citing *Medford Irrigation District v. Western Bank*, 66 Or.App. 589, 676 P.2d 329, 332 (1984) (proof that bank followed industry not always conclusive; the standard practice must also be reasonable)). Thus, the mere fact of the depositor's negligence is not enough to save the bank from liability, because if the bank failed to observe reasonable commercial standards, that ends the inquiry and places liability squarely with the bank. *See Putnam, supra*, 547 N.Y.S.2d at 614, 546 N.E.2d at 907 ("[under section 3–406], when both the bank and its customer have been negligent—and even when the customer is by far the more negligent party— the entire loss may still be asserted against the bank.")

## A.

### 1. *The First Check.*

■ FIB contends that Zambia National's negligence precludes recovery in connection with both of the checks at issue. To this end, FIB points to "uncontroverted badges of negligence" on the part of Zambia National. Defendant's Post–Trial Memorandum of Law at 37–38. Concerning the first check, FIB highlights, *inter alia:* the lack of written procedures governing account reconciliation; chronic backlogs in account reconciliation; Zambia National's policy of accumulating daily statements and not reconciling accounts until the end of the month; Zambia National's failure to examine foreign exchange applications underlying outstanding (unreconciled) items. Although each of these derelictions was antecedent to the making of the first and the second of the forgeries, FIB can point to nothing in the record to establish a causal relationship between such carelessness and those forgeries.

■ Additionally, FIB cites the fact that, until August 1990, FIB was working from a signature list from 1986. This argument is more tempting than those discussed above, since it was admitted by Kumwenda (1) that Zambia National was aware of forgeries at some point prior to August 1990, and (2) that he changed his signature in the 1990 signature list as a precaution against further forgeries. Conceivably, had Zambia National provided a new signature list as requested at the end of 1989, it might have enabled FIB to spot forgeries of Kumwenda's signature. Nevertheless, Zambia National's failure to respond to DeGregorio's initial requests for an updated signature list was not negligence, given that on the occasions when DeGregorio requested the new list, the checks which FIB was questioning were found to be genuine. At least at that point, Zambia National did not have reason to believe that the risk of forgery was any greater than normal due to a stale signature list.

■ FIB further characterizes as negligence Zambia National's decision to use the services of Associated Printers in Lusaka for both the task of printing blank checks and assembling the signature list. Although the use of Associated Printers for both functions is closely analogous to the scenario of an employer who leaves a checkbook and rubber signature stamp in an unlocked drawer, thereby affording an unscrupulous employee the opportunity to obtain payment over multiple unauthorized signatures, the comparison is of little help to FIB. The record does not contain evidence that Zambia National's use of Associated Printers was, in fact, the context within which the forger acquired the means to counterfeit and forge the checks; the forger might just as easily have been an employee at Zambia National possessing knowledge of that bank's procedures for making payments out of its foreign accounts, as the fraudulent wire transfer of September 1990 strongly suggests. Because there is absent any causal nexus between Associated Printers' access to the signatures and the making of the forgeries, this argument fails.

■ Nor was Zambia National's refusal to purchase checks from FIB negligence. Although such an arrangement might have facilitated the task of tracking account activity on a daily basis, the non-use of specially coded or magnetically sensitized checks does

not constitute negligence within the meaning of § 3–406. *See* Comment 3. The court also rejects FIB's arguments concerning Daka's failure to follow-up on the two checks after examining the account statements; this matter is properly addressed within the context of §§ 3–404 and 4–406. Thus, the court concludes, that notwithstanding the undeniable and numerous examples of slovenly internal procedures at Zambia National, there is nothing in the record to show that those derelictions substantially contributed to the forgery of the first check. Accordingly, because FIB cannot make out the elements of the defense of customer negligence as they have been defined within § 3–406 of the U.C.C., that defense does not provide a safe harbor regarding the first of the two checks at issue.

### 2. *The Second Check.*

 FIB's defense of negligence fares better, however, with regard to the second check. It bears repetition, that under the statute, the burden of loss will shift to the customer if, by reason of his negligence, he enabled the forger to obtain payment via an unauthorized signature. Although Zambia National's sloth *prior to* January 16, 1990 did not bear a causal relationship to the making of the forgery of the first check, a *subsequent* intervening event did place Zambia National on notice to the possibility of forgeries on two unrelated checks. As the court will explain more fully below, Zambia National negligently failed to take steps to protect its account, and as a result, the same forger who had passed the first check was able to obtain payment on the second.

 Specifically, subsequent to the payment of the first check, but almost a month prior to the payment of the second check on April 3, 1990, Zambia National identified the two "March checks" discussed *supra,* which it then believed might bear the unauthorized signature of Kumwenda. The record does establish that Zambia National investigated the matter of the March checks for several weeks, at least. However, although it was clearly on notice to the possible existence of a forgery, or the signing of checks by Kum-

wenda without authorization, Zambia National did not thereupon take steps to monitor or discover *other,* subsequent checks purporting to bear Kumwenda's signature (such as the second of the two checks at issue here). Nor, even then, after several requests had gone unheeded, did it choose at that time to supply an updated signature list, or to examine the daily telexed account statements in order to determine whether other checks involving inordinate sums of money had been presented to FIB. The short of the matter is, that once Zambia National was alerted to the March checks, it was then placed in a better position than FIB to prevent further forgeries, but instead "rested on its oars". Where, as here, a depositor is on notice concerning the forgery of its checks and does not take action to prevent future forgeries, such inaction constitutes negligence that may substantially contribute to such later forgeries. *See* N.Y.U.C.C. § 3–406, Comment 7. *See also,* 81 N.Y.Jur.2d, *Negotiable Instruments and Other Commercial Paper,* § 663 (citing *Guardian Life Ins. Co. v. Chemical Bank,* 47 A.D.2d 608, 363 N.Y.S.2d 820, 821 (1975) (insurance company not negligent in forwarding check to broker in the absence of proof that company was on notice of prior forgeries of indorsements by same broker)).

### B.

 Zambia National asserts, that even if it substantially contributed to the making of either of the unauthorized signatures at issue, it is still entitled to recover from defendant as to both checks because FIB failed to exercise ordinary care in the process of signature verification. Zambia National emphasized in particular that portion of Jones' testimony in which she stated that check verification was often concluded within 30 to 45 minutes. Accordingly, Zambia National maintains that, on a day when over 200 signatures required verification, FIB could have spent only a few seconds in retrieving the signature list, locating the appropriate signature and then verifying each check—thereby rendering the entire process perfunctory at best, and making it virtually impossible to

spot any but the most blatant of forgeries.[6]

If Zambia National's factual premise were true, the court would have little difficulty in concluding that FIB did, indeed, fail to exercise ordinary care. However, the court is not persuaded that Jones spent less than an hour verifying 200 checks; rather, the balance of the record established that the procedure could take the better part of the morning. For her part, DeGregorio testified to spending approximately an hour and half performing an even more cursory level of review. Based on the foregoing, the court finds that on the days in question, the DDA area took such time as was required to complete the task with reasonable care.

Testimony by Santiso, defendant's banking expert, established that FIB's written procedures relating to check verification complied with the standard of care prevailing in the banking industry, and in fact exceeded that standard inasmuch as FIB required all checks issued by domestic customers to be verified, irrespective of the amount of the check. Moreover, DeGregorio's testimony established that she personally compared signatures with which she was unfamiliar, such as those of Zambia National's employees, to the signature list, thus duplicating the work Jones had performed. It follows that in the area of check verification, FIB conformed to—and arguably exceeded—the standard of care prevalent in the banking industry. Accordingly, FIB has made out a *prima facie* showing that it exercised ordinary care. *See Rhode Island Hosp. Trust Nat. Bank v. Zapata Corp.*, 848 F.2d 291, 294 (1st Cir.1988) (in absence of proof that national banking practice is unreasonable, expert testimony establishing that Rhode Island bank followed practice of other banks in nation makes out

*prima facie* defense of ordinary care under § 4–406).

The court holds, therefore, that Zambia National's negligence substantially contributed to the making of unauthorized signatures on the second, but not the first, of the checks at issue. Inasmuch as FIB exercised reasonable commercial standards in reviewing signatures on checks presented for payment, the court concludes that Zambia National is entitled to judgment as to the first, but not the second, check.

### III.

■■■ Although the court bases its judgment relative to the second check on FIB's defense of negligence, the court sees fit to state its opinion concerning FIB's two other defenses, neither of which would have obtained. The first of these latter two defenses may be disposed of quickly. Here, the court considers whether Zambia National's conduct constituted a ratification pursuant to U.C.C. § 3–404.[7] FIB maintains that, because Daka reviewed the two checks in question and did not alert FIB to the forgeries until several months later, his silence should be construed as an approval of the signatures. The court disagrees, and considers that the record does not make out a case for ratification.

■■■ Although the court's research reveals a dearth of caselaw in New York on the subject of ratification under U.C.C. § 3–404, we take notice of the decisions of other courts construing the same provision of the U.C.C. in their respective jurisdictions. The essence of a ratification pursuant to § 3–404 is that the drawer has full knowledge of all the material facts *and* manifests an intent to ratify the unauthorized signature. *See Ther-*

---

**6.** In support of this argument, Zambia National relies heavily upon DeGregorio's statement that the task of verifying a single signature should ordinarily take between five minutes and half an hour. The court accepts the contrary testimony of Santiso, who stated that while it might take time to investigate a discrepancy, the ordinary task of verifying a check would not require such lengthy attention.

**7.** Section 3–404 provides:

(1) Any unauthorized signature is wholly inoperative as that of the person whose name is

signed unless he ratifies it or is precluded from denying it . . .

(2) Any unauthorized signature may be ratified for all purposes of this Article. . . .

The commentary further states:

"[t]he words 'or is precluded from denying it' are retained in subsection (1) to recognize the possibility of an estoppel against the person whose name is signed, as where he expressly or tacitly represents to an innocent purchaser that the signature is genuine; and to recognize the negligence which precludes a denial of the signature." U.C.C. § 3–404 comment 4.

*mo Contracting Corp. v. Bank of New Jersey,* 69 N.J. 352, 354 A.2d 291, 295–296 (1976); *Thieme v. Seattle–First Nat'l Bank,* 7 Wash.App. 845, 502 P.2d 1240, 1242 (1972) (cited in Thomas M. Quinn, UNIFORM COMMERCIAL CODE COMMENTARY AND LAW DIGEST, § 3–404 at 3–161 (1987 & 1991 Supp.)).

FIB stresses that Zambia National, in the person of Tim Daka, did possess such knowledge and impliedly consented to the transfer of funds from its account at FIB. In support of this proposition, FIB relies heavily upon *Stella v. Dean Witter Reynolds, Inc.,* 241 N.J.Super. 55, 574 A.2d 468, *certif. denied,* 122 N.J. 418, 585 A.2d 412 (1990).

In *Stella,* the plaintiff was duped by a stockbroker at Dean Witter into authorizing the stockbroker to withdraw funds from the plaintiff's brokerage account and invest them in a bogus "Special Situations Fund," a fictional investment vehicle which in actuality was the broker's method of fraudulently converting client money to his own use. Dean Witter drew checks payable to the plaintiff, drawn on Dean Witter's checking account at Morgan Guaranty Trust Company, and charged the amount to the plaintiff's brokerage account. The plaintiff then obligingly endorsed the checks in blank and delivered them to the stockbroker, who thereupon cashed the checks and explained to his client that the funds were safely invested in the "Special Situations Fund." Of course, the plaintiff's account statements contained no notation whatsoever of shares purchased in the "Fund", but did contain the notations "check" and "funds paid". *See* 574 A.2d at 471.

There, after several transactions in which the plaintiff unwittingly greatly enriched his stockbroker, the plaintiff in *Stella* finally uncovered the fraud and sued the bank at which the miscreant stockbroker had cashed the checks. After a jury verdict in the plaintiff's favor, the intermediate appellate court in New Jersey reversed, finding that the plaintiff possessed knowledge of the material facts in issue, and intentionally approved of the transfers of funds from his account. For the *Stella* court, the plaintiff's knowledge and approval of the transfer of funds was tantamount to a ratification of the forged endorse-

ments on checks payable to him. *See id.,* 574 A.2d at 474.

*Stella,* however, is inapposite to the case at bar. Here, there is no evidence that Daka possessed knowledge that the signatures appearing on the two checks at issue were forgeries; rather, he merely failed to make inquiries concerning a pair of checks involving the payment of abnormally large sums of money. For the same reason, the record does not support a finding of intent on the part of Zambia National to acquiesce in or approve the previously unauthorized signatures. *See In re Lou Levy & Sons Fashions, Inc.,* 785 F.Supp. 1163, 1167 (S.D.N.Y.1992), *aff'd,* 988 F.2d 311 (2d Cir.1993) (finding *Stella* inapplicable because "ratification involves knowing and intentional conduct, not mere negligence"). Thus, the court would not find the defense of ratification applicable.

## IV.

Nor would FIB have prevailed on its final defense under § 4–406, which provides that a customer must "exercise reasonable care and promptness to examine the statement and [canceled checks] to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof." If a customer fails in this duty, under certain circumstances he may be precluded from asserting the unauthorized signature against the bank, provided that the bank itself exercised ordinary care. § 4–406(2), (3). Specifically, the customer may not recover for subsequent checks that are either altered or bear unauthorized signatures by the same wrongdoer, and "paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen calendar days...." § 4–406(2). This rule comports with the principle that liability should rest on the party with superior access to the material facts, who is better situated to prevent repetition of the forgery. *See generally, Putnam, supra; see also, Lou Levy, supra,* 988 F.2d at 315.

The statement containing the first canceled check in the series was available to Zambia National not later than February 9, 1990. Ordinarily, therefore, Daka's failure to exer-

**1392**

cise reasonable care in the examination of the January 16, 1990 statement and notify FIB would preclude any claim by Zambia National relating to the second check because the latter was paid subsequent to the expiration of the statutory fourteen day notice period contained in § 4–406(2). However, as Zambia National correctly points out, U.C.C. § 4–103(1) preserves the right of the parties to vary the terms of their statutory responsibilities by agreement, in accordance with the common law conception of freedom of contract, provided that no such agreement may abrogate the bank's responsibility to exercise good faith and ordinary care.[8] Thus, the bank and depositor may agree to include conditions precedent or vary the statute of limitations under the U.C.C. consistent with the principle that such agreements may not be manifestly unreasonable. *See New York Credit Men's Adjustment Bureau, Inc. v. Manufacturers Hanover Trust Co.,* 41 A.D.2d 912, 343 N.Y.S.2d 538, 540 (1973); *P.T.A. Pub. Sch. 72 v. Manufacturers Hanover Trust,* 138 Misc.2d 289, 524 N.Y.S.2d 336, 338 (N.Y.City Civ.Ct.1988). Here, the parties extended the period within which Zambia National was required to examine its statement before losing its right to a recredit. The agreement consists of the following language appearing on the FIB account statements: "Please examine at once, as account will be considered correct if no report is received within 60 days." Since the first forged item, paid January 17, 1990, and its corresponding account statement was available to Zambia National on February 9, 1990, and the second check in the series was paid before the expiration of the extended 60 day notice period, Zambia National would not have been precluded from asserting the forgery of the second check against FIB under § 4–406.

### V.

The court has considered the parties' remaining contentions and finds them to be without merit.

### CONCLUSION

The payment of the two checks at issue was obtained over forged signatures. Thus, the payment was unauthorized.

As to the first of the two checks at issue, none of FIB's attempted defenses are sustained by the record. Zambia National is entitled to judgment in the amount of $147,694. Zambia National shall additionally recover costs and prejudgment interest at the New York statutory rate, in conformance with CPLR § 5001(a), from the time the cause of action accrued, i.e., January 17, 1990.

Zambia National's negligence substantially contributed to the making of the second forged signature at issue in this case. In examining the signature on that check, FIB acted in accordance with reasonable commercial standards. Consequently, FIB has successfully maintained the affirmative defense of customer negligence in conformance with U.C.C. § 3–406, and Zambia National is therefore precluded from asserting the unauthorized signature against FIB.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

---

**8.** Section 4–103(1) states:

The effect of the provisions of this Article may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.